**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| Mario Alexander GUEVARA,<br><br>*Petitioner*,<br><br>v.<br><br>George STERLING, in his official capacity as Director of the Atlanta Field Office, Immigration and Customs Enforcement; Warden of Folkston ICE Processing Center; Todd LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement; Kristi NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; and Pamela BONDI, in her official capacity as Attorney General, United States Department of Justice,<br><br>*Respondents*. | Case No. _____<br><br><br>**PETITION FOR**<br>**WRIT OF HABEAS CORPUS**<br>**AND COMPLAINT** |

## <u>INTRODUCTION</u>

1.      This case concerns the Government's detention of Mario Alexander Guevara, an award-winning journalist, in order to retaliate against him for his constitutionally-protected speech and reporting, and to gag him from further speaking and reporting. Mr. Guevara is the only journalist in the United States currently detained because of his press activity. He is currently detained in solitary confinement at the Folkston ICE Detention Center, where he remains jailed in a cell 22 hours a day.

2.      Mr. Guevara has lived in the United States since 2004 and is legally authorized to live and work in the country. He runs his own digital news organization, MG News, based in the Atlanta area, which reports on local, national, and international news. As part of his reporting, Mr. Guevara regularly livestreams, records, and publishes video of law enforcement

officers engaged in their official duties in public. Mr. Guevara's reporting reaches hundreds of thousands of people.

3.      Mr. Guevara was arrested by local police in DeKalb County on June 14, 2025, while reporting on a protest against the Trump administration. He was subsequently transferred to U.S. Immigration and Customs Enforcement custody on June 18, 2025.

4.      At a bond hearing before an Immigration Judge on July 1, 2025, the Government asserted that Mr. Guevara posed a danger to the community because of his reporting. The Immigration Judge rejected that argument and granted bond.

5.      After rejecting efforts by Mr. Guevara's family and attorney to pay the bond and have him released, on July 3, 2025, the Government simultaneously filed an emergency motion for a discretionary stay of the bond order and an appeal of the order with the Board of Immigration Appeals. In arguing for a stay and reversal of the bond order, the Government repeatedly asserted that Mr. Guevara presents a danger to the community because he films and records law enforcement activities and shares his reporting with the public. The Board of Immigration Appeals granted the stay of the bond order on July 7, 2025.

6.      Since July 10, 2025, all pending criminal charges against Mr. Guevara have been dismissed, yet he remains in detention. Mr. Guevara has committed no crime, had no criminal history prior to his June 14, 2025 arrest, and has no pending criminal charges against him now. He is a highly respected journalist and has received numerous accolades for his reporting. He is deeply devoted to his family—including his medically compromised son, a U.S. citizen who requires his care—and is a beloved member of his civic and religious communities.

7.      The Government's continuing detention of Mr. Guevara on the basis of his

journalism is intended to silence him, prevent him from reporting in the future, and retaliate against him for his past speech and reporting, in violation of the First Amendment. The Government's continuing detention of Mr. Guevara also violates the substantive due process clause of the Fifth Amendment because it has no legitimate objective and is punitive.

8.      Accordingly, this Court should grant Mr. Guevara's petition for a writ of habeas corpus so that he may rejoin his family and community and pursue his constitutionally protected journalistic activities.

## PARTIES

9.      Petitioner Mario Alexander Guevara is a non-citizen journalist who legally resides in Lilburn, Georgia and is currently detained at the Folkston ICE Processing Center in Folkston, Georgia.

10.      Respondent George Sterling is named in his official capacity as the Director of the Atlanta Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security ("DHS"). In this capacity, he is responsible for the administration of immigration laws and the execution of detention determinations and is a custodian of Petitioner. Respondent Sterling's address is 180 Ted Turner Dr SW, Ste 522, Atlanta, GA 30303.

11.      Respondent Warden is named in his official capacity as the Warden of the Folkston ICE Processing Center. As Warden, he is responsible for the operations of the Folkston ICE Processing Center, including overseeing the people in the facility's custody, and as such he is a custodian of the Petitioner. Respondent Warden's address is 3026 GA-252 E, Folkston, GA 31537.

12.      Respondent Todd Lyons is named in his official capacity as the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible

for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of Georgia; is legally responsible for any effort to detain Petitioner; and as such is a custodian of the Petitioner. His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13.     Respondent Kristi Noem is named in her official capacity as the Secretary of the Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1103(a); routinely transacts business in the Southern District of Georgia; is legally responsible for any effort to detain Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14.     Respondent Pamela Bondi is named in her official capacity as Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of Georgia; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g); and as such is a custodian of the Petitioner. Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

## JURISDICTION & VENUE

15.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2241 (habeas corpus); and Article I, § 9, cl. 2 (Suspension Clause) of the U.S. Constitution.

16.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id*. §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

17.     Venue is proper in the Southern District of Georgia under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. Petitioner is physically detained in this District at the ICE Processing Center, in Folkston, Georgia. Respondent Warden is the Director of the Folkston ICE Processing Center and resides in this District.

## FACTS

### A.    Mr. Guevara's Background

18.     Mr. Guevara holds citizenship from El Salvador. Before coming to the United States, he worked as a photojournalist for *La Prensa Gráfica*, one of the two largest newspapers in El Salvador. In 2004, he fled El Salvador with his family after suffering violence and harassment for his work as a journalist. That year, he lawfully entered the United States on a B-1 visa and has resided in this country since.

19.     Mr. Guevara lives in Lilburn, Georgia, in Gwinnett County, with his wife and three children, two of whom are U.S. citizens and one of whom is a recipient of Deferred Action for Childhood Arrivals ("DACA"). His mother, brother, and sister are U.S. citizens. His brother is a U.S. military veteran, who served in Afghanistan.

20.     Mr. Guevara applied for relief from removal in 2007. An Immigration Judge denied his application in June 2012, and Mr. Guevara appealed to the Board of Immigration Appeals ("BIA") in July 2012. However, in December 2012, the BIA granted a joint motion by the Government and Mr. Guevara to administratively close the removal proceedings against him as a matter of prosecutorial discretion—effectively authorizing him to continue living and working in the United States. Since that time, and until this summer, the Government has not sought to remove Mr. Guevara from the United States.

21.     Mr. Guevara has work authorization, a social security number, and has paid taxes as required by law. He is also eligible for lawful permanent residency. He is the

beneficiary of an I-130 Petition for Alien Relative, filed by his 21-year-old U.S. citizen son who suffers speech issues, recurring seizures, and intense nerve pain after suffering a stroke during surgery to remove a brain tumor. Mr. Guevara provides important care for his son, including transporting him to and from medical appointments and work. Upon approval of the I-130 Petition, Mr. Guevara will have a visa immediately available to him and is eligible to file an I-485 Application for Adjustment of Status to obtain a Green Card.

22.     Prior to his June 14, 2025 arrest, Mr. Guevara had never been arrested. He is an upstanding member of his community. He attends a church in the Atlanta area, has taught Sunday school for teenagers, assists the elderly and infirm in his community, and gives his time, skills, and resources to those in need. In addition to caring for his son, Mr. Guevara regularly visits a friend who is handicapped and blind, takes her to his house, helps her move around, feeds her, and carries her in his arms if necessary.

23.     Mr. Guevara has a significant and diverse community of support in the United States, including his immediate family, professional colleagues, civic and church leaders, fellow church congregants, and many friends, all of whom attest to his character, his professionalism, and his role as a community leader.

**B.     Mr. Guevara's Journalism in the United States**

24.     Mr. Guevara has continued working as a journalist since coming to the United States. For many years, he worked as a reporter for *Mundo Hispanico*, Georgia's largest Spanish-language newspaper.

25.     In 2024, Mr. Guevara launched his own digital news organization, MG News. MG News covers local, national, and international news. Its reporting focuses on the Hispanic community in the Atlanta area, but is also a source of news for people outside of the Atlanta area, and even outside the state of Georgia. MG News currently employs five people but Mr.

Guevara is the primary newsgatherer.

26.     MG News publishes stories and other content on its website and its Facebook page, which has over 110,000 followers. Mr. Guevara also regularly publishes MG News content on his own Facebook page, which has over 780,000 followers.

27.     MG News has two primary avenues for communicating with its audience: online articles and Facebook livestreams and videos. MG News has typically published about six posts per day. The Facebook livestreams constitute the heart of what MG News does, in line with its slogan "Lo Vio Primero Aqui," which means "You Saw It Here First."

28.     The topics of immigration and law enforcement are important aspects of MG News's beat. MG News regularly livestreams, records, and publishes video of law enforcement officers engaged in their official duties in public. This type of reporting is important both to MG News's consumers and to the public writ large. It allows the public to be informed about and aware of the work of public officials, which in turn informs community decisions. It also permits the public to monitor and advocate against any documented wrongdoing and to hold law enforcement accountable. Equally, it permits the public to identify law enforcement practices or activity it considers effective.

29.     Since its inception in 2024, MG News has covered ground-breaking news on immigration and law enforcement. For example, in 2024, it covered the mistaken-identity arrest of Ximena Arias-Cristobal from Dalton, Georgia, a college student who was wrongly accused of traffic violations and detained by ICE for two weeks. Mr. Guevara conducted a livestream video with her immediately upon her release on bond from the Stewart Detention Center.

30.     When livestreaming or recording law enforcement activities, Mr. Guevara

follows standard reporting practices and strives to maintain his independence as a journalist. He carries his press credentials and keeps his car marked with MG News emblems. He maintains a safe distance from  his subjects, including law enforcement officers, suspects, and vehicles. He does not physically or verbally interfere with or intervene in law enforcement action. He follows police orders. He documents what is visible to him of officers engaged in their official duties and narrates what he observes. He mostly does so from public streets, sidewalks, and parks and only goes on private property when invited to do so by residents of that property.

31.    When reporting while driving, he attaches his phone, which he uses for livestreaming and recording, to a mount on the windshield under the rearview mirror. He maintains a reasonable distance from the cars in front of him.

32.    When determining what to film or report on, Mr. Guevara only follows leads provided by his followers, who alert him to likely law enforcement activity, often with a focus on immigration law enforcement. He goes to scenes because another member of the public has already told him that they think law enforcement activity is going on. He only films activity occurring in public. He does not know who law enforcement officers or agencies are until he arrives at the scene. His subjects are typically ICE officers, but sometimes they are other law enforcement officers.

33.    When covering protests, Mr. Guevara clearly distinguishes himself as a journalist acting independently of protesters. He wears a vest with an easily readable label identifying him as "PRESS." He also wears a press credential and verbally identifies himself as a journalist. He does not engage in protest activities while newsgathering and follows standard  journalistic  protocol,  including  maintaining  a  reasonable  distance  from  law

enforcement officers and complying with their reasonable instructions while still exercising his legal right to observe and engage in newsgathering of what he sees in public places.

34.    Mr. Guevara's journalism is widely respected and has won numerous awards. He was nominated for a Southeast Regional Emmy Award in 2023, 2021, and 2019, and he won an Emmy in 2021 for his reporting at *Mundo Hispanico*. In 2021 and 2022, he was recognized by the Georgia Hispanic Chamber of Commerce as one of the 50 Most Influential Latinos in Georgia ("Latinos Influyentes en Georgia"). In 2019, his reporting was the subject of a *New York Times* documentary titled "Boca del Lobo."

35.    Through Mr. Guevara's reporting on law enforcement activities, he has developed close and positive relationships with several law enforcement departments, including regularly riding along with officers and interviewing them to better educate his viewers about law enforcement's perspective. In 2024, he was recognized for his community work by the Gwinnett County Sheriff's Office, rode along with officers from the Gwinnett County Police Department, and partnered with the Lilburn Police Department to discuss the implications of the Georgia Criminal Alien Track and Report Act. That year, he also covered the dangers of border crossings with border patrol officers in Arizona and rode along with a sheriff in Texas, releasing a video in which he shared the sheriff's message that people should refrain from crossing the border for their safety. In 2022, he helped the Gwinnett and Norcross Police Departments give out school supplies to families and rode along with officers of the Norcross Police Department. In 2021, he worked with the Gwinnett County Sheriff's Office to give out food to families for Thanksgiving. In 2018, the Gwinnett County Police Department invited him to represent the Hispanic community at its 200-year anniversary celebration.

36.    Mr. Guevara is a pillar of the Hispanic community in the Atlanta area, and his

relationships with the Hispanic community, law enforcement, and civic and religious organizations allow him to serve as a bridge between various stakeholders in his community. For example, the *New York Times* documentary "Boca del Lobo" shows Mr. Guevara serving as an intermediary between federal immigration officers and a person of interest in 2019, providing a vital avenue for de-escalation that ensured the safety of both the officers and the person arrested.[1]

37.    Mr. Guevara's unique ability to connect different communities informs how he views his role as a journalist: to provide fair and accurate information to his audience, regardless of where the story leads. In his own words, "I have to be completely impartial [in my reporting]," and "[w]hen I have to expose something bad about the authorities, I've done it. And when I have to expose something bad about the immigrant community, I have done it as well. And I will continue to do both things, because that's my job."[2]

## C.    Mr. Guevara's June 14, 2025 Arrest and the DeKalb County Charges

38.    On June 14, 2025, Mr. Guevara was covering a protest organized to express opposition to the Trump administration at Chamblee Tucker Road and Northcrest Road in DeKalb County for MG News.

39.    Bodycam footage from officers shows that Mr. Guevara clearly distinguished himself as a journalist acting independently of protesters. Mr. Guevara was wearing a red shirt, a vest with "PRESS" emblazoned on the front and back, and a helmet. He was positioned away

---

[1]    Jesse Moss, *Boca del Lobo,* at 6:15-6:35 (N.Y. Times May 7, 2019), https://www.nytimes.com/video/opinion/100000006430559/boca-del-lobo.html.

[2] *Id.* at 5:20, 9:00.

from the protestors and was livestreaming the event using his cell phone.[3]

40.    The footage records an officer singling Mr. Guevara out and informing other officers to "Keep an eye on the guy in the red shirt. If he gets to the road, lock his a\*\* up. . . . He's been warned multiple times." Another officer responds by motioning to his vest and asking "Press?" The first officer confirms "Yep."[4]

41.    A little over a minute later, the footage shows that Mr. Guevara did subsequently step onto the roadway in order to stay clear of and avoid obstructing oncoming police officers while continuing to document the protest. Officers then immediately rushed and arrested him despite his repeated statements that he was a member of the media. Mr. Guevara cooperated and did not resist.[5]

42.    Mr. Guevara was charged by the Doraville Police Department with obstruction of a law enforcement officer, unlawful assembly, and being a pedestrian on or along the roadway, and detained at the DeKalb County Jail.

43.    Following Mr. Guevara's arrest, ICE lodged a detainer against Mr. Guevara.

44.    On June 16, 2025, the DeKalb County Magistrate Court ordered Mr. Guevara released on a bond set by the DeKalb County Sheriff's Office. However, Mr. Guevara remained in custody at the DeKalb County Jail as a result of the ICE detainer against him. As described in further detail below, on June 18, ICE took him into its custody and transferred him to the Folkston ICE Processing Center.

---

[3] George Chidi, *Bodycam of James Taylley, No Kings Day Protest, June 14, 2025*, at 31:40–36:00 (YouTube, July 21, 2025), https://www.youtube.com/watch?v=Zcc3KcPwR5I&t=1899s.

[4] *Id.*

[5] During Mr. Guevara's arrest, the arresting officer removes Mr. Guevara's "PRESS" vest, revealing a press credential hanging around his neck. *See id.*

45.    On June 25, 2025, DeKalb County dismissed all charges against Mr. Guevara, stating in a Notice that No Accusation Will be Filed: "At the time of his arrest, the video evidence shows Mr. Guevera generally in compliance and does not demonstrate the intent to disregard law enforcement directives. Given the lack of a clear criminal intent by Mr. Guevara to ignore any lawful commands, the case is dismissed as charged."

**D.    Gwinnett County Sheriff's Office's Charges**

46.    On June 17, 2025, one day after the DeKalb County Magistrate Court ordered Mr. Guevara released on a bond, the Gwinnett County Sheriff's Office filed three misdemeanor traffic charges against Mr. Guevara and issued warrants for his arrest. The charges were for failure to obey signs or control devices on May 13, 2025, and for the unlawful use of a telecommunications device and reckless driving on May 20, 2025.

47.    The Gwinnett County Sheriff's Office produced a report describing the incidents underlying the warrants. The report indicates that the Office reviewed livestreaming videos posted by Mr. Guevara on social media and that its review of the videos was the basis for the traffic violation charges.

48.    The livestreaming videos that formed the basis for the misdemeanor traffic violations are no longer available on the MG News or Mr. Guevara's Facebook pages. Neither Mr. Guevara nor an employee of MG News removed these videos from these Facebook pages. Mr. Guevara is not aware of how or why the videos were removed.

49.    On July 2, 2025, Gwinnett County dismissed two of the charges against Mr. Guevara and on on July 10, 2025, it dismissed the remaining charge.

**E.    Mr. Guevara's Detention by ICE and Bond Proceedings**

50.    On June 18, 2025, one day after the new, now-dismissed traffic charges were filed by Gwinnett County, Mr. Guevara was transferred from DeKalb County Jail to ICE

custody and detained at the Folkston ICE Processing Center.[6]

***Immigration Judge Orders Mr. Guevara's Release on Bond***

51.    On June 20, 2025, Mr. Guevara filed for bond with the Immigration Judge ("IJ"). Family members, colleagues, civic and church leaders, fellow church congregants, and many others in his community filed letters in support of his release.

52.    On July 1, 2025, Mr. Guevara appeared at a hearing before the IJ on his request for bond. The IJ granted bond the same day and issued a summary order to that effect. At the time of the hearing, DeKalb County had dismissed all charges against Mr. Guevara.

53.    On July 11, 2025, the IJ issued a Written Decision and Order memorializing his July 1 summary order ("Bond Decision"). By the time the Bond Decision was issued, both DeKalb and Gwinnett Counties had dismissed all charges against Mr. Guevara and there were no longer any pending criminal charges against Mr. Guevara.

54.    The IJ found that Mr. Guevara does not pose a danger to the community:

Respondent has no other criminal history in his twenty years of residing within the United States. *See* Exhibit 1. Respondent in fact has a history of cooperation with law enforcement agencies. *See* Exhibit 2, p.143; Exhibit 3, Tab C-1. In fact, a law enforcement officer, in his personal capacity, believes Respondent to be an asset to the community. *See* Exhibit 2, Tab K ("I am employed by a metro Atlanta police department. In my experience, Mario has been a valuable asset in engaging with the Hispanic community and helping to build stronger relationships between law enforcement and Hispanic residents."). Further, Respondent has a history of following the laws of the United States, as he legally entered the U.S. with a B1 visa, he has employment authorization and a social security number so that he can legally work in the United States, and he has a history of paying his taxes . . . . Thus, . . . the Court does not find Respondent poses a danger to the community were he to be released.

---

[6] On June 23, 2025, the Government filed a motion to recalendar Mr. Guevara's removal proceedings at the BIA, which is still pending. On July 9, Mr. Guevara filed a motion of non-opposition to the Government's motion to recalendar and requested remand to the Immigration Court because Mr. Guevara is eligible to apply for adjustment of status. On July 15, the Government filed an opposition to Mr. Guevara's motion to remand.

55.     The IJ recognized the troubling First Amendment implications of this case. He noted that "Respondent has received recognition as a journalist" and "at the time of his alleged crimes he was acting as a journalist." He further stated that "if Respondent was acting as a journalist, he is protected by freedom of speech as detailed in the Constitution and longstanding, precedential case law." And he noted that "reporting on ICE raids in the community, as Respondent has done, is a national concern and many other journalists across the nation are also reporting on this issue."

56.     At the bond hearing, the Government also alleged that Mr. Guevara was a danger to the community because he owned a gun. The IJ disagreed, noting that the Department had offered no evidence into the record on this point and that "the only firm evidence established by the Department's questioning of Respondent is that there is a gun in Respondent's home that he shares with three United States citizens (USC),[7] his brother is in the military, and Respondent fired the weapon at a firing range." The IJ took into account "that in his twenty years within the United States [Respondent] has never been charged with a crime involving a firearm." He further noted that "[t]he Department did not reference [or substantiate] a potential criminal statute that Respondent would have been violating."

57.     On information and belief, it is highly unusual for the Government to claim a detainee is a danger to the community at a bond hearing solely because a firearm is present in the home, without any evidence of misconduct involving the weapon.

58.     The IJ found that setting bond would ameliorate any flight risk and that "the positive equities outweigh the negative factors":

> Respondent . . . has . . . resided in the United States since his admittance in

---

[7] Mr. Guevara resides with two, not three, U.S. citizens—his two U.S. citizen children. *See supra* ¶ 19.

2004, and his immediate family are located within the U.S. *See* Exhibit 2, p.14; Exhibit 2, Tab C; and Exhibit 2, Tab F. Respondent also has community support for his release from detention . . . . A former Georgia State Representative called Respondent "a compassionate and active member of the community." *See* Exhibit 2, Tab K. . . . A friend of Respondent's who is handicapped and blind stated that Respondent visits her, takes her to his house, helps her move around, feeds her, and carries her in his arms if necessary. *Id.* Respondent also has a multitude of other family members, friends, community members, church leaders, and fellow church members who attest to Respondent's character, focus on his family and community, and giving character. *See generally* Exhibit 2, Tab K (pgs. 218-279 are character references).

. . . Respondent's son Oscar also has serious medical conditions, including a brain tumor that was resected. *See* Exhibit 2, Tab G. Oscar will require lifelong care. *See* Exhibit 1; Exhibit 2, Tab G. Per Respondent's brother-in-law, as well as many others in the record, Oscar depends on Respondent to attend work and medical appointments. *See* Exhibit 2, Tab K. Per the letters attesting to Respondent's character in the record, Respondent takes his responsibilities as husband and father very seriously, and his brother, a military veteran of Afghanistan, states how much Respondent's family misses him. *Id.*

. . . [T]he Court finds that Respondent has a plethora of reasons to remain with his family and comply with any future immigration directives and proceedings.

59.    The IJ concluded:

The Court considered all the evidence in the record. The Court does take Respondent's pending charges into consideration, but the Court also takes into account that Respondent has not been criminally convicted of any crime in his twenty years in the United States, his family resides within the United States, he has vast community support, and his alleged criminal conduct occurred while Respondent was working as a journalist (which is not a new vocation of Respondent's). Taking all direct and circumstantial evidence into consideration, the Court finds that the Respondent has successfully born his burden of establishing that he would not pose a danger to the community if released nor does he pose such a significant flight risk that no bond would be appropriate.

**Mr. Guevara's Continued Detention after Immigration Judge Grants Bond**

60.    On July 1, 2025, immediately following the IJ's summary order granting bond,

Mr. Guevara's son Oscar attempted to pay Mr. Guevara's bond online, but each time he

15

attempted to submit payment, he received a message stating that his father was not releasable.

61.    On July 2, 2025, Oscar took a cashier's check to the ICE Atlanta Field Office to attempt to pay the bond in person. However, an ICE official rejected his attempt to pay the bond and conveyed to Oscar that ICE did not accept the judge's order and was appealing it.

62.    Later that day, Mr. Guevara's attorney, Jessica Calmes, also went to the ICE Atlanta Field Office to attempt to pay Mr. Guevara's bond in person. Ms. Calmes was informed by an ICE official that ICE was holding Mr. Guevara until Gwinnett County was able to transfer him into its custody. That same day, Gwinnett County dismissed two out of the three misdemeanor traffic violation charges against Mr. Guevara.

63.    On July 3, 2025, Gwinnett County transferred Mr. Guevara to the Gwinnett County Jail where he was booked for the one then-remaining traffic violation charged by Gwinnett County and had his two phones, including his work phone, confiscated. That day, the Gwinnett County Magistrate Court automatically set bond for Mr. Guevara, which Mr. Guevara's family promptly paid. However, Mr. Guevara was not released but was transferred again to the Floyd County Jail, where he was held on an ICE detainer.

64.    That same day, the Government filed a Notice of Appeal from a Decision of an Immigration Judge ("Notice of Appeal") and an Emergency Motion for Discretionary Stay ("Stay Motion"). The Government did not serve its Notice of Appeal or Stay Motion on Mr. Guevara or his counsel.

65.    On information and belief, it is highly unusual for the Government to file an appeal of an IJ's decision to grant bond, let alone an emergency motion for a discretionary stay, where an individual has no significant criminal history, presents strong evidence that he is not a danger to the community, and has demonstrated prima facie eligibility to adjust his

status to lawful permanent resident after having entered lawfully into the United States.

66.     On information and belief, the Government generally reserves bond appeals, and especially stays, for cases involving serious criminal conduct, clear evidence of danger to the community, or major flight risk.

67.     The Government's Notice of Appeal and Stay Motion rely almost exclusively on Mr. Guevara's reporting as justification for his continued detention.

68.     In the Notice of Appeal, the Government states that Mr. Guevara is a danger to the community because Mr. Guevara had "on five separate occasions . . . recorded or live streamed" law enforcement officers and "post[ed] videos of undercover agents, their vehicles, and tag numbers." The Government further states that "[l]ocal law enforcement reviewed the respondent's public posts and learned that the videos were viewed by hundreds of thousands of people." The Government also states, in apparent reference to Mr. Guevara's reporting at the June 14, 2025 protest, that Mr. Guevara "defied orders by law enforcement to move to the sidewalk and out of traffic . . . so that he could live stream the events to his social media."[8]

69.     Livestreaming, recording, and publishing videos of law enforcement officers performing their official duties in public are protected by the First Amendment. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). This right encompasses circumstances where the broadcast or recording identifies the officer and the officer's vehicle, *see, e.g.,*

---

[8] The Government's Notice of Appeal states at the end that "[t]he respondent testified that he unlawfully possesses a firearm at his home." But the IJ determined that "the only firm evidence established by the Department's questioning of Respondent" at the bond hearing "is that there is a gun in Respondent's home that he shares with three United States citizens (USC), his brother is in the military, and Respondent fired the weapon at a firing range." The IJ further noted that "[t]he Department did not reference [or substantiate] a potential criminal statute that Respondent would have been violating." Thus, Mr. Guevara has never testified—nor has the Government established—that he unlawfully possesses a firearm at his home.

*Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1122, 1129 (11th Cir. 2021). It also encompasses circumstances where the broadcast or recording documents undercover officers. *See Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995); *see also Smith*, 212 F.3d at 1333 (citing *Williamson* with approval).

70.    At the time the Government filed its Notice of Appeal, DeKalb County had determined that video evidence demonstrated that Mr. Guevara had not defied orders by law enforcement but was "generally in compliance" and did "not demonstrate the intent to disregard law enforcement directives."

71.    The Government's Stay Motion similarly argues that Mr. Guevara is a danger to the community because of his reporting. In particular, it repeats the statement in the Notice of Appeal that "[o]n five separate occasions, . . . the respondent filmed undercover officers, their vehicles, and the suspects of the investigation and posted videos of the interactions to his Facebook account." The Stay Motion describes each of these incidents, focusing on Mr. Guevara's filming of law enforcement officers performing their official duties in public:[9]

- "[F]ollowing a February 19, 2025, encounter, the respondent . . . post[ed] a video on his Facebook account showing the identity of an officer."

- "On March 3, 2025, . . . the respondent recorded an undercover vehicle with an officer behind the wheel . . . . The respondent again posted a video of the encounter on his Facebook page that showed the vehicle's tag number. Local law enforcement subsequently saw the video was viewed over 200,000 times . . . ."

- "On April 2, 2025, the respondent . . . filmed uniformed, plain clothed, and undercover officers. Again, the respondent posted this video to his Facebook page . . . ."

- "On May 15, 2025, the respondent . . . recorded undercover officers and agents. The respondent live streamed the event . . . and . . . then saved

---

[9] The Government states there were five incidents but describes six incidents.

and posted the live stream as a video on his Facebook page."

- "On May 17, 2025, local law enforcement reviewed a video of a prior live stream of the respondent on his Facebook page."

- "[O]n May 20, 2025, the respondent arrived at an undercover human trafficking operation and . . . live streamed to his Facebook page. . . . Again, the respondent posted video of undercover officers, their vehicles, and license plate numbers to his Facebook page . . . ."

72.    The Government's Stay Motion states that Mr. Guevara "compromised the safety of undercover officers by posting their identities and vehicle tag numbers to his social media that received hundreds of thousands of views" and that "[h]is actions jeopardized future operations by posting videos of undercover vehicle tag numbers that received similar views."[10]

73.    As discussed above, livestreaming, recording, and publishing videos of law enforcement officers—even when revealing their identities and their vehicles, and even when they are undercover—are protected by the First Amendment.

74.    At the time the Government filed both its Notice of Appeal and Stay Motion, DeKalb County had already determined that video evidence demonstrated that Mr. Guevara had not defied orders by law enforcement but was "generally in compliance" and did "not demonstrate the intent to disregard law enforcement directives."

75.    The Government's Stay Motion also states that Mr. Guevara "put the safety of bystanders and pedestrians at significant risk by recklessly chasing law enforcement officers in his car while taking video." At the time the Government filed the Stay Motion, Gwinnett County had already dismissed two of the three misdemeanor traffic charges against Mr.

---

[10] The Stay Motion states that Mr. Guevara's "unapologetic admission to unlawfully possessing a firearm further demonstrates his dangerousness to the community." As discussed above, Mr. Guevara has never admitted to unlawfully possessing a firearm in his home—nor has the Government established this fact. *See supra* n.8.

Guevara and dismissed the remaining traffic charge days later. The Gwinnett County Magistrate Court also automatically set bond given the nature of the remaining traffic charge.

76.     On July 7, 2025, the BIA granted the Stay Motion.

77.     On July 8, 2025, ICE transferred Mr. Guevara to the Federal Correctional Institution in Atlanta. While detained there, he was extorted by other detainees, who recognized him from his work as a journalist. These detainees threatened him with violence if he did not ask his family to send them money. Mr. Guevara complied out of fear for his safety.

78.     On July 10, 2025, ICE transferred Mr. Guevara back to the Folkston ICE Processing Center, where he has been detained in isolation, purportedly for his benefit.

79.     That same day, Gwinnett County dismissed the remaining misdemeanor traffic violation charge against Mr. Guevara.

80.     As of July 10, 2025, all criminal charges against Mr. Guevara have been dropped.

### *Mr. Guevara's Continued Detention After All Criminal Charges Were Dropped*

81.     On July 12, 2025, Mr. Guevara filed a Motion for Summary Affirmance of the Bond Order. On July 15, 2025, he filed a Motion to Lift the Stay Order.

82.     On July 31, 2025, the Government filed its opposition to the Motion to Lift the Stay Order.

83.     In its opposition, the Government continues to rely on Mr. Guevara's reporting activities as justification for his continued detention, citing again to the "five separate occasions" described in the Stay Motion and stating that Mr. Guevara "compromised the safety of undercover officers by posting their identities and vehicle tag numbers."

84.     The Government's opposition also states that Mr. Guevara "put the safety of

bystanders at risk by chasing law enforcement officers in his car while taking video." However, at the time the Government filed its opposition, Gwinnett County had dismissed all three misdemeanor traffic charges against Mr. Guevara.

85.    On August 6, 2025, the Government filed its Brief on Appeal ("Appeal Brief") in response to Mr. Guevara's Motion for Summary Affirmance, and Mr. Guevara filed his Opposition to DHS Appeal of Immigration Court's Grant of Bond.

86.    The Government's Appeal Brief again relies on Mr. Guevara's reporting as justification for his continued detention. It states that "on five different occasions, spanning from February to March 2025," Mr. Guevara filmed "officers, their vehicles, including their vehicle tag information, and the suspects of the investigation" and that he "post[ed] the videos on his Facebook account, some of which received hundreds of thousands of views." The Appeal Brief describes each of these incidents, focusing on Mr. Guevara's filming of law enforcement officers performing their official duties in public as the problem:[11]

- "On February 19, 2025, the respondent filmed officers from the Sheriff's Office . . . . The respondent later posted the encounter with the officer on his Facebook page raising safety concerns for the officer."

- "On March 3, 2025, . . . the respondent arrived and began filming the undercover officer and the officer's vehicle, including its county issued tag . . . . The respondent posted this video to his Facebook page . . . . Because the video received hundreds of thousands of views, the officer had to request a new county issued tag."

- "On April 2, 2025, the respondent . . . filmed uniformed and plain clothed officers. He again filmed undercover vehicles and their license plates. The respondent posted the video to his Facebook page, specifically identifying the law enforcement vehicles to his viewers. This video also received thousands of views."

- "On May 15, 2025, the respondent . . . recorded undercover deputies and agents from the Drug Enforcement Agency (DEA) . . . . [T]he

---

[11] The Government states there were five incidents but describes six incidents.

respondent livestreamed the scene including undercover officers, their vehicles, and possibly vehicle tag numbers from his Facebook page and later posted the video to his account."

- "On May 17, 2025, local law enforcement reviewed another livestreamed video that the respondent posted on his Facebook page."

- "On May 20, 2025, the respondent appeared at an undercover human trafficking operation . . . . As officers left, the respondent followed one of the undercover vehicles while livestreaming from his phone. . . . The respondent again posted the video to his Facebook page."

87.    In the Appeal Brief, the Government acknowledges that "it is true that the respondent is a journalist and was acting in his capacity as a journalist." Nevertheless, it states that Mr. Guevara "endangered the safety of undercover officers by publicly posting their identities and vehicle tag numbers."[12]

88.    As discussed above, livestreaming, recording, and publishing videos of law enforcement officers—even when revealing their identities and their vehicles, and even when they are undercover—is protected by the First Amendment.

89.    The Government's Appeal Brief also states that Mr. Guevara "jeopardized the safety of bystanders, pedestrians, and other motorists by pursuing law enforcement officers while disregarding traffic signs and livestreaming while driving." However, at the time the Government filed the Appeal Brief, Gwinnett County had dismissed all three misdemeanor traffic charges against Mr. Guevara.

### F.    Mr. Guevara's Continued Detention Is Harming Him and Chilling Other Journalists

90.    Mr. Guevera is currently detained in solitary confinement at the Folkston ICE

---

[12] The Appeal Brief states that Mr. Guevara's "admission to unlawfully possessing a firearm further illustrates that he is a danger to the community." As discussed above, however, Mr. Guevara never admitted to unlawfully possessing a firearm—nor has the Government established this fact. *See supra* n.8.

Detention Center, where he remains in a tiny cell 22 hours a day. He only gets two hours a day outside the cell, during which time he is taken to another bigger cell that looks like a dog crate where he can see the sky and breathe fresh air. He has lost approximately 20 pounds during his time in detention. He is experiencing panic attacks, nightmares, and difficulty sleeping.

91.    The Government's detention of Mr. Guevara has gagged, and was designed to gag, him, as he cannot report the news from his cell while he is detained. As a result, Mr. Guevara's detention has also deprived his substantial audience, and the public at large, of the information, including about law enforcement activities, revealed through his reporting.

92.    Mr. Guevara has also been chilled by his detention. He intends to continue reporting in the future but believes he will need to ask individuals who are U.S. citizens to follow leads about law enforcement. He is heartbroken about having to change his longstanding reporting practices but is not confident that any precautions he takes can in fact prevent further retaliatory action by the government.

93.    ICE officers have admitted to Mr. Guevara while transporting him between detention centers that he has been a "headache" for them and that they can now conduct their operations without him following them.

94.    Mr. Guevara's detention has significantly impacted MG News. MG News is a small operation and Mr. Guevara is the primary newsgatherer. Mr. Guevara has a wide network of contacts from his many years as a trusted local journalist, through which people reach out to him. No other employee at MG News has the same deep community ties. Detained in a cell nearly five hours' drive away from Atlanta, Mr. Guevara cannot assist with reporting, communicating with sources, and guiding other reporters at MG News. As a result of Mr. Guevara's absence, MG News's reporting has decreased from about six posts per day to two

to three posts per day. Mr. Guevara's detention has also impacted MG News financially and resulted in declining income.

95.     Mr. Guevara's detention has instilled fear in the other employees of MG News, who are frightened that they too may be subject to retaliatory consequences for reporting on law enforcement activity.

96.     His detention has also chilled other journalists, especially non-citizen journalists, across the country, who report on law enforcement activity, or are thinking of doing so. His detention, with no clear end in sight, sends a sharply deterrent message to others who want to share information, including through livestreaming or recording, about what law enforcement officers do in public.

97.     Every day, Mr. Guevara's continued detention compounds the harm to his First Amendment rights by preventing him from fulfilling his journalistic vocation.

98.     If the Government is permitted to detain Mr. Guevara on the theory that his reporting is dangerous, it sends a message to all journalists that they too could face retaliatory consequences based on the same theory for reporting or otherwise shining a light on law enforcement activity.

99.     Mr. Guevara is the canary in the coal mine for journalists reporting nationwide on law enforcement activity.

100.    Mr. Guevara is also suffering from additional harms as a consequence of his continued detention. He is the primary breadwinner of his family, which has struggled financially since his detention. Without the help of their church and a GoFundMe page that was set up following his arrest, Mr. Guevera's family would be unable to pay for their basic necessities.

101.    Mr. Guevara's detention is also preventing him from providing care to his son Oscar. In August 2021, Oscar was diagnosed with a large brain tumor and suffered a stroke during surgery to remove the tumor. As a result, Oscar suffers from a stutter, periodic seizures, and intense nerve pain. Mr. Guevara helps transport Oscar to and from medical appointments and work. He also provides critical emotional support to Oscar when he is struggling or in pain. He cannot offer that practical or emotional support while in detention.

102.    Mr. Guevara's wife and other two children are also suffering from his prolonged absence from home, not only financially, but also emotionally.

103.    To prevent further constitutional injury, Mr. Guevara should be released to his family and community while his immigration case proceeds through the proper channels.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES IS NEITHER NECESSARY NOR APPROPRIATE

104.    In general, a § 2241 petitioner must exhaust available administrative remedies before he can obtain relief in federal court. *Santiago-Lugo v. Warden*, 785 F.3d 467, 474–75 (11th Cir. 2015). However, the exhaustion requirement in § 2241 cases is "judge-made," rather than jurisdictional, *id*., and the Supreme Court has described "three broad sets of circumstances" where "the interests of the individual weigh heavily against requiring administrative exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992).

105.    At least two of those circumstances apply here.

106.    First, "requiring resort to the administrative remedy" would cause Mr. Guevara "undue prejudice" due to the "irreparable harm" he would suffer if "unable to secure immediate judicial consideration of his claim." *Id*. at 146–47. As set forth *infra*, Respondents are causing Mr. Guevara irreparable harm by detaining him in violation of his First and Fifth Amendment rights. *See also FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir.

2017) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)). Delaying this Court's review of Mr. Guevara's unlawful detention would only prolong his constitutional injuries. In addition, Mr. Guevara is suffering several other irreparable harms from his detention, including the deprivation of his liberty, separation from his family and community, and inability to pursue his work as a journalist.

107.    Second, the administrative remedy here is inadequate because the BIA "lacks institutional competence to resolve the particular type of issue presented," *McCarthy*, 503 U.S. at 147–148—namely, the constitutionality of Mr. Guevara's detention. *See Vargas v. U.S. Dep't of Immigr. & Naturalization*, 831 F.2d 906, 908 (9th Cir. 1987) ("the BIA does not have jurisdiction to adjudicate constitutional issues"); *Matter of C-*, 20 I. & N. Dec. 529, 532 (B.I.A. 1992) (BIA is powerless to address *ex post facto* claim, since "it is settled that the [IJ] and this Board lack jurisdiction to rule upon the constitutionality of the [INA] and the regulations"). The Board's limited jurisdiction generally bars review of as-applied constitutional challenges of the kind Mr. Guevara raises here. *See, e.g.*, *Matter of Ramos*, 15 I. & N. Dec. 671, 675 (B.I.A 1976) (powerless to address respondent's "as applied" equal protection and due process challenges); *Matter of H-*, 3 I. & N. Dec. 411, 419, 456 (B.I.A. 1949) (powerless to address First Amendment and retroactivity arguments "as applied to the respondent").

108.    Nor do any of the other factors that warrant exhaustion apply here. *See Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1034–35 (5th Cir. 1982) (listing factors). There is no need for the agency to develop the factual record to aid this Court's review, and Mr. Guevara's constitutional claims do not require the agency's expertise, as those claims fall squarely within the purview of this Court. Nor would this Court's review encourage the circumvention of agency procedures in the future, as petitioners will have occasion to raise First and Fifth

Amendment challenges to retaliatory detention only in extraordinary cases like Mr. Guevara's. And finally, agency review would not eliminate the need for this Court's review, as the BIA cannot hear Mr. Guevara's constitutional claims in the first place.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the First Amendment to the United States Constitution**

109.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein, particularly paragraphs 1–8 and 18–100.

110.    Mr. Guevara's reporting on law enforcement activities—a key aspect of which is livestreaming, recording, and publishing video of law enforcement officials carrying out their duties in public—is protected by the First Amendment. *See Smith*, 212 F.3d at 1333. As speech and press activity on issues of public concern, Mr. Guevara's reporting lies "at the heart of First Amendment protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (internal citations omitted).

111.    The Government's continued detention of Mr. Guevara constitutes a prior restraint because it is designed to prevent him from livestreaming, recording, or publishing video of law enforcement activity. Prior restraints are the most suspect form of speech regulation and must satisfy a particularly rigorous form of scrutiny to survive, which the Government cannot satisfy here.

112.    The Government's continued detention of Mr. Guevara also deprives audiences of his speech and reporting on matters of public concern, and chills other journalists, especially non-citizen journalists, from newsgathering, speaking about, and reporting on law enforcement activities.

113.    The Government's continued detention of Mr. Guevara additionally violates the First Amendment because it constitutes retaliation. His speech and press activity is protected; the continued detention would chill a person of ordinary firmness from engaging in similar First Amendment-protected activity; and his reporting is a substantial motivating factor for Defendants' continued detention of him.

## SECOND CLAIM

### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

114.    Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein, particularly paragraphs 1–8 and 18–100.

115.    The Fifth Amendment to the U.S. Constitution provides that "[n]o person . . . shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V.

116.    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

117.    Moreover, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* at 690.

118.    The Government's continued detention of Mr. Guevara violates his due process rights. Immigration detention must further the twin goals of (1) ensuring the non-citizen's appearance during removal proceedings, and (2) preventing danger to the community. *Id.*; *accord Sopo v. U.S. Att'y Gen.*, 825 F.3d 1199, 1217 (11th Cir. 2016), *vacated*, 890 F.3d 952

(11th Cir. 2018). The Government has not demonstrated that Mr. Guevara—a father to U.S. citizen children, including a son who depends on him for long-term care; a celebrated journalist with a successful news outlet; and a devoted member of his civic and religious communities who has no significant criminal history and whom the IJ found poses no danger or flight risk— needs to be detained. There is no credible argument that Mr. Guevara cannot be safely released.

119.    Moreover, Mr. Guevara's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972); *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons," *Demore v. Kim*, 538 U.S. 510, 532–33 (2003) (Kennedy J., concurring).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner Mario Alexander Guevara respectfully requests this Court to grant the following:

(1)    Assume jurisdiction over this matter;

(2)    Order Respondents to show cause why this Petition should not be granted within three days;

(3)    Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately upon payment of the $7,500 bond set by the Immigration Judge;

(4)    Declare that Respondents' actions to continue to detain Petitioner based on, and in order to prevent, his First-Amendment protected speech and press activity violate the First Amendment and the Due Process Clause of the Fifth Amendment;

(5)    Award reasonable attorneys' fees and costs for this action; and

(6)    Grant such further relief as the Court deems just and proper.

Dated: August 20, 2025

Respectfully submitted,

*/s/ Andres Lopez-Delgado*

Scarlet Kim*
Vera Eidelman*
Tyler Takemoto*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
scarletk@aclu.org
veidelman@aclu.org
ttakemoto@aclu.org

Michael K.T. Tan*
American Civil Liberties Union Foundation
425 California Street, 7th Floor
San Francisco, CA 94104
(808) 490-3806
m.tan@aclu.org

Giovanni Diaz (GA Bar # 246622)
Jessica Calmes (GA Bar # 202719)
Zachary Gaeta (GA Bar # 507940)
Diaz & Gaeta Law, LLC
2400 Herodian Way SE, Suite 275
Smyrna, GA 30080
(678) 503-2780
(404) 341-9370
diaz@dglawga.com
calmes@dglawga.com
gaeta@dglawga.com

Andres Lopez-Delgado (GA Bar # 552876)
Cory Isaacson*
American Civil Liberties Union
Foundation of Georgia
P.O. Box 570738,
Atlanta, GA 30357
(770) 415-5490
adelgado@acluga.org
cisaacson@acluga.org

Clare R. Norins (GA Bar # 575364)
Ward Evans* (GA Bar # 487147)
First Amendment Clinic
University of Georgia School of Law
P.O. Box 388
Athens, Georgia 30603
(706) 542-1419
cnorins@uga.edu
ward.evans@uga.edu

Donald F. Samuel (GA Bar # 624475)
Garland, Samuel & Loeb, P.C.
3151 Maple Drive
Atlanta, GA 30305
(404) 262-2225
dfs@gsllaw.com

*Pro hac vice* applications forthcoming

*Counsel for Petitioner*