**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| Mario Alexander GUEVARA, | Case No. 2:25-cv-00104-LGW-BWC |
| *Petitioner*, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND/ OR PRELIMINARY INJUNCTION** |
| George STERLING, in his official capacity as Director of the Atlanta Field Office, Immigration and Customs Enforcement *et al.*, | |
| *Respondents*. | |

## INTRODUCTION

Petitioner Mario Guevara is currently the only journalist in the United States who is being detained because of his reporting. The Government has openly stated that it is keeping him in detention because he livestreams, records, and publishes video of law enforcement officials performing their duties in public—activities that lie at the heart of the First Amendment's protections. Mr. Guevara seeks preliminary relief to halt the Government's extraordinary effort to gag his future speech and reporting, and to retaliate against him for his speech in the past.

Mr. Guevara is an award-winning journalist whose work is watched by hundreds of thousands of people. He is also a devoted father to his three children—two of whom are U.S. citizens, including a son who requires long-term care following surgery for a brain tumor—and a beloved and respected member of his civic and religious communities. There are no pending criminal charges against him, and an Immigration Court has already determined that he does not pose a danger to the community or a flight risk and should be released. Yet the Government has continued to detain him specifically because of his speech and press activity—which the

Government asserts is a danger to society. To the contrary, it is First Amendment-protected activity that exemplifies our nation's commitment to the open and free discussion of government affairs.

Each of the preliminary relief factors weighs strongly in Mr. Guevara's favor. First, he is likely to succeed on the merits of his First Amendment claim because his continued detention is both a prior restraint and retaliation for protected speech. His detention also violates his Fifth Amendment right to substantive due process because there is no legitimate basis for continuing his imprisonment. Second, without preliminary relief, Mr. Guevara is suffering multiple irreparable harms including the loss of his freedom; the inability to continue his journalistic work, which harms his core speech rights and career; separation from his family and community; and inability to care for his medically compromised son. Finally, the equities and public interest weigh heavily in Mr. Guevara's favor. Respondents' actions not only gag and punish Mr. Guevara; they also have an immediate and palpable chilling effect on other journalists, particularly non-citizen journalists, who cover the actions of public officials. For all these reasons, this Court should issue an order releasing Mr. Guevara while this habeas action proceeds.

## FACTUAL BACKGROUND

## I. MR. GUEVARA'S LIFE AND COMMUNITY TIES IN THE UNITED STATES

Mr. Guevara holds citizenship from El Salvador and has resided in the United States since 2004. Guevara Decl. ¶¶ 2–3. That year, he fled El Salvador with his family after suffering violence and harassment for his photojournalism for *La Prensa Gráfica*, one of the two largest newspapers in El Salvador. *Id*. ¶ 2. He lawfully entered on a B-1 visa. *Id*. He lives in Lilburn, Georgia, with his wife and three children, two of whom are U.S. citizens. *Id*. ¶ 3. His mother, brother, and sister are also U.S. citizens, and his brother served in the U.S. military, including in Afghanistan. *Id*.

Mr. Guevara applied for relief from removal in 2007. *Id*. ¶ 4. Though an Immigration Judge

denied his application, the Board of Immigration Appeals ("BIA") granted a joint motion to administratively close his removal proceedings in December 2012 as a matter of prosecutorial discretion—effectively authorizing him to continue living and working in the United States. BIA Decision, Kim Decl. Ex. 1. Since that time, and until this summer, the Government has not sought to remove Mr. Guevara. Guevara Decl. ¶ 4.

Mr. Guevara has work authorization, a social security number, and has paid taxes as required by law. *See* Bond Decision, Kim Decl. Ex. 6 at 6 ("Ex. 6"). He is also eligible for lawful permanent residency as the beneficiary of an I-130 Petition for Alien Relative, filed by his 21-year-old U.S. citizen son, Oscar. *See id.* Oscar suffers speech issues, recurring seizures, and intense nerve pain after suffering a stroke during surgery to remove a brain tumor. Saenz Decl. ¶ 6.[1]

Prior to his June 14, 2025 arrest while reporting on law enforcement's response to a protest, described in detail below, Mr. Guevara had never been arrested. Ex. 6 at 5–6. He is an upstanding member of his community who attends church, has taught Sunday school for teenagers, assists the elderly and infirm in his community, and gives his time, skills, and resources to those in need. Guevara Decl. ¶ 6. In addition to caring for his son, Mr. Guevara regularly visits a close friend who is disabled and blind, takes her to his house, helps her move around, feeds her, and even carries her in his arms if necessary. Ex. 6 at 6; Good Moral Character Letters in Supp. of Imm. Bond, Kim Decl. Ex. 7 at 12 ("Ex. 7"). Mr. Guevara has a significant and diverse community of support, including his family, professional colleagues, civic and church leaders, fellow church congregants, and many friends, all of whom attest to his character, professionalism, and role as a community leader. *See generally* Ex. 7.

---

[1] Upon approval of the I-130 Petition, a visa will be immediately available to Mr. Guevara, and he will be able to file an I-485 Application to obtain a Green Card. Guevara Decl. ¶ 5.

## II.    MR. GUEVARA'S JOURNALISM IN THE UNITED STATES

Mr. Guevara has continued working as a journalist since coming to the United States. Guevara Decl. ¶ 7. His work is widely respected and has received numerous awards. *Id.* ¶ 21. For many years, he reported for *Mundo Hispanico*, Georgia's largest Spanish-language newspaper. *Id.* ¶ 7; Saenz Decl. ¶ 12. In 2024, he launched his own digital news organization, MG News, which reports on local, national, and international news, with a focus on what is most relevant to the metro-Atlanta Hispanic community. Guevara Decl. ¶ 8. MG News publishes on its website and its Facebook page, which has over 110,000 followers. *Id.* ¶ 9. Mr. Guevara, who is the primary newsgatherer for MG News, also regularly publishes MG News content on his own Facebook page, which has over 780,000 followers. *Id.* ¶¶ 8–9.

Immigration and law enforcement are important aspects of MG News's beat. *Id.* ¶ 12. For example, in 2024, MG News covered the mistaken-identity arrest of Ximena Arias-Cristobal from Dalton, Georgia, a college student who was wrongly accused of traffic violations and detained by ICE for two weeks. *Id.* ¶ 13; Madrigal Decl. ¶ 7. Mr. Guevara livestreamed an interview with her immediately upon her release on bond from the Stewart Detention Center. Guevara Decl. ¶ 13.

As part of his reporting, Mr. Guevara regularly livestreams, records, and publishes video of law enforcement officers engaged in their official duties in public. *Id.* ¶¶ 10, 12. When doing so, he maintains a safe distance from his subjects, including officers, suspects, and vehicles. *Id.* ¶ 14. He does not physically or verbally interfere with law enforcement action. *Id.* He follows police orders. *Id.* He documents what is visible to him and narrates what he observes. *Id.* ¶ 15. He films from public streets, sidewalks, and parks and only goes on private property when invited to do so by residents of that property. *Id.* When reporting while driving, he keeps his phone mounted on

4

the windshield and maintains a reasonable distance from the cars in front of him. *Id*. ¶ 16.

Mr. Guevera works hard to maintain his journalistic independence. *Id*. ¶¶ 11, 14. In his own words: "I have to be completely impartial," whether that means "I have to expose something bad about the authorities" or "about the immigrant community."[2] Though Mr. Guevara's reporting is at times critical of government action, he has also developed positive relationships with law enforcement agencies through his work. For example, he has ridden along with the Gwinnett and Norcross Police Departments, and the Gwinnett County Sheriff's Office has recognized him for his work in the community. Good Character Exs. in Supp. of Imm. Bond, Kim Decl. Ex. 8.

### III.    MR. GUEVARA'S JUNE 14, 2025 ARREST

On June 14, 2025, while Mr. Guevara was documenting a protest on behalf of MG News, police officers arrested him. Calmes Decl. ¶ 3. The Doraville Police Department charged him with obstruction of a law enforcement officer, unlawful assembly, and being a pedestrian on or along the roadway. Notice of No Accusation Filed, Kim Decl. Ex. 3 at 1 ("Ex. 3"). He was detained at the DeKalb County Jail and ICE lodged a detainer against him. Calmes Decl. ¶ 3.

On June 16, 2025, the DeKalb County Magistrate Court ordered Mr. Guevara released on a bond set by the DeKalb County Sheriff's Office. DeKalb Bond Order, Kim Decl. Ex. 2 ("Ex. 2") But Mr. Guevara remained in custody as a result of the ICE detainer. Calmes Decl. ¶ 4. As described below, on June 18, ICE took him into its custody. *See infra* Factual Background V.A. On June 25, 2025, DeKalb County dismissed all charges against him, stating: "At the time of his arrest, the video evidence shows Mr. Guevera generally in compliance and does not demonstrate the intent to disregard law enforcement directives. Given the lack of a clear criminal intent by Mr.

---

[2] Jesse Moss, *Boca del Lobo*, N.Y. Times, at 5:20, 9:00 (May 7, 2019), https://www.nytimes.com/video/opinion/100000006430559/boca-del-lobo.html.

Guevara to ignore any lawful commands, the case is dismissed as charged." Ex. 3 at 1.

## IV.    GWINNETT COUNTY SHERIFF OFFICE'S CHARGES

On June 17, 2025, the Gwinnett County Sheriff's Office filed three misdemeanor traffic charges against Mr. Guevara—for failure to obey signs or control devices on May 13, 2025, and unlawful use of a telecommunications device and reckless driving on May 20, 2025—and issued warrants for his arrest. Gwinnett Cnty. Warrants & Sheriff's Off. Report, Kim Decl. Ex. 4 at 3–5 ("Ex. 4"). On July 2, 2025, Gwinnett County dismissed two of the charges, and on July 10, it dismissed the remaining charge. Calmes Decl. ¶¶ 8, 11.

## V.    MR. GUEVARA'S IMMIGRATION BOND PROCEEDINGS

### A.    Immigration Judge Orders Mr. Guevara's Release on Bond

On June 18, 2025, Mr. Guevara was transferred to ICE custody at the Folkston ICE Processing Center. Calmes Decl. ¶ 5. On June 30, he filed for bond and, on July 1, appeared at a bond hearing. Ex. 6 at 1. The Immigration Judge ("IJ") granted bond that day and issued a summary order to that effect, Kim Decl. Ex. 5, memorialized in a Written Decision and Order on July 11, Ex. 6. By that time, all charges against Mr. Guevara had been dismissed. Calmes Decl. ¶ 12.

The IJ found that Mr. Guevara does not pose a danger to the community:

Respondent has no other criminal history in his twenty years of residing within the United States. . . . Respondent in fact has a history of cooperation with law enforcement agencies. . . . In fact, a law enforcement officer, in his personal capacity, believes Respondent to be an asset to the community. *See* Exhibit 2, Tab K ("I am employed by a metro Atlanta police department. In my experience, Mario has been a valuable asset in engaging with the Hispanic community and helping to build stronger relationships between law enforcement and Hispanic residents."). Further, Respondent has a history of following the laws of the United States, as he legally entered the U.S. with a B1 visa, he has employment authorization and a social security number so that he can legally work in the United States, and he has

a history of paying his taxes.

Ex. 6 at 5–6.

The IJ also recognized the troubling First Amendment implications of Mr. Guevara's case, noting that "at the time of his alleged crimes he was acting as a journalist" and was "protected by freedom of speech as detailed in the Constitution and longstanding, precedential case law." *Id.* at 4–5. The IJ also noted that "reporting on ICE raids in the community . . . is a national concern and many other journalists across the nation are also reporting on this issue." *Id.* at 5 n.8.

At the hearing, the Government had also argued that Mr. Guevara was a danger because he owned a gun. *See id.* at 4. The IJ disagreed, noting the lack of any evidence in the record on this point, and that "the only firm evidence established by the Department's questioning of Respondent is that there is a gun in Respondent's home that he shares with three United States citizens (USC), his brother is in the military, and Respondent fired the weapon at a firing range." *Id.*[3] The IJ also noted "that in his twenty years within the United States [Respondent] has never been charged with a crime involving a firearm," and that "[t]he Department did not reference [or substantiate] a potential criminal statute that Respondent would have been violating." *Id.* at 4, 4 n.4.

The IJ found that setting bond would ameliorate any flight risk and that "the positive equities outweigh the negative factors":

> Respondent . . . has . . . resided in the United States since his admittance in 2004, and his immediate family are located within the U.S. . . . Respondent also has community support for his release from detention. . . . A former Georgia State Representative called Respondent "a compassionate and active member of the community." . . . Respondent also has a multitude of other family members, friends, community members, church leaders, and fellow church members who attest to Respondent's character, focus on his family and community, and giving character. . . .
> Respondent's son Oscar also has serious medical conditions, including a brain

---

[3] Mr. Guevara resides with two, not three, U.S. citizens—his two U.S. citizen children. *See* Guevara Decl. ¶ 3.

> tumor that was resected. . . . Oscar will require lifelong care. . . . [and] depends on Respondent to attend work and medical appointments. . . . Per the letters attesting to Respondent's character in the record, Respondent takes his responsibilities as husband and father very seriously, and his brother, a military veteran of Afghanistan, states how much Respondent's family misses him.

*Id*. at 6–7. After "consider[ing] all the evidence in the record," the IJ found "that the Respondent has successfully . . . establish[ed] that he would not pose a danger to the community if released, nor does he pose such a significant flight risk that no bond would be appropriate." *Id*. at 7.

### B. Mr. Guevara's Continued Detention After Immigration Judge Grants Bond

On July 1, 2025, immediately following the IJ's summary order, Mr. Guevara's son Oscar attempted to pay Mr. Guevara's bond online, but repeatedly received a message stating that his father was not releasable. Saenz Decl. ¶ 8. The next day, Oscar went to the ICE Atlanta Field Office to pay in person. *Id.* However, an ICE official rejected the check and conveyed that ICE did not accept the judge's order and was appealing. *Id*. Later that day, Mr. Guevara's attorney, Jessica Calmes, also went to the Field Office to pay the bond, but was informed that ICE was holding Mr. Guevara until Gwinnett County transferred him into its custody. Calmes Decl. ¶ 7.

That same day, Gwinnett County dismissed two of the misdemeanor traffic charges against Mr. Guevara. *Id.* at ¶ 8. On July 3, 2025, Gwinnett County transferred Mr. Guevara to the Gwinnett County Jail, where he was booked for the then-remaining single traffic violation and had his two phones, including his work phone, confiscated. *Id*. ¶ 9. That day, the Gwinnett County Magistrate Court automatically set bond for Mr. Guevara, *id*., which Mr. Guevara's family promptly paid, Saenz Decl. ¶ 8. However, Mr. Guevara was not released but transferred once again, this time to the Floyd County Jail, where he was once again held on an ICE detainer. Calmes Decl. ¶ 9.

That same day, the Government appealed the IJ's order, Notice of Appeal, Kim Decl. Ex. 9, and sought an emergency stay, Stay Mot., Kim Decl. Ex. 10 ("Ex. 10"). On July 7, 2025, the

BIA granted the stay motion. BIA Stay Order, Kim Decl. Ex. 11.

On July 8, 2025, Mr. Guevara was transferred to the Federal Correctional Institution in Atlanta. Calmes Decl. ¶ 10. Other detainees, who recognized him from his work as a journalist, threatened him with violence if he did not ask his family to send them money; Mr. Guevara complied out of fear for his safety. Guevara Decl. ¶¶ 32–33. On July 10, 2025, Mr. Guevara was transferred back to the Folkston ICE Processing Center, Calmes Decl. ¶ 11, where he has been detained in solitary confinement since, Guevara Decl. ¶ 30.

That same day, Gwinnett County dismissed the remaining misdemeanor traffic charge. Calmes Decl. ¶ 11. As of July 10, 2025, there are no charges against Mr. Guevara. *Id*. at ¶ 12.

### C. Mr. Guevara's Continued Detention After All Criminal Charges Are Dropped

On July 12, 2025, Mr. Guevara filed a Motion for Summary Affirmance of the Bond Order, Kim Decl. Ex. 12, and, on July 15, also filed a Motion to Lift the Stay Order, Kim Decl. Ex. 13. On July 31, the Government opposed his stay motion, Kim Decl. Ex. 14 ("Ex. 14"), again primarily arguing that Mr. Guevara must remain in detention because of his reporting on law enforcement activity in public. On August 6, the Government filed its Brief on Appeal, Kim Decl. Ex. 15 ("Ex. 15"), which also highlighted Mr. Guevara's reporting as the justification for his continued detention, and Mr. Guevara filed his Opposition to DHS's Appeal, Kim Decl. Ex. 16.

## VI.   MR. GUEVARA'S CONTINUED DETENTION IS HARMING HIM AND CHILLING OTHER JOURNALISTS

Mr. Guevera is currently detained in solitary confinement at the Folkston ICE Detention Center, where he remains in a cell 22 hours a day. Guevara Decl. ¶ 30. He has lost approximately 20 pounds during his detention. Saenz Decl. ¶ 19. He cannot report the news from his cell, which prevents him from fulfilling his journalistic vocation and deprives his substantial audience, and the public at large, of the information, including about law enforcement activities, revealed through

his reporting. Guevara Decl. ¶ 34; ; *see also id.* ¶ 36 (describing chill on any future reporting). Every day Mr. Guevara spends detained compounds the First Amendment harms.

Mr. Guevara's detention has also significantly impacted MG News. *Id.* ¶¶ 34–35; Madrigal Decl. ¶¶ 12–14. He is the primary newsgatherer. Guevara Decl. ¶ 8. Because of his many years as a trusted local journalist, people reach out to him with tips and resources, and no other MG News employee has the same deep ties. *Id* ¶ 34; Madrigal Decl. ¶ 14. While detained, he cannot assist with reporting, communicate with sources, or guide other reporters. Guevara Decl. ¶ 34. As a result, MG News's reporting has decreased from about six to two to three articles or posts per day, Madrigal Decl. ¶ 14, and the outlet has experience declining income, Guevara Decl. ¶ 35.

Mr. Guevara's detention has instilled fear in the other MG News reporters, who are frightened that they too may be subject to retaliation for reporting on law enforcement activity. Madrigal Decl. ¶ 17. And his detention has a chilling effect on other journalists, especially non-citizens, across the country, who report on law enforcement activity. Zamora Decl. ¶¶ 20–22.

Mr. Guevara is also suffering from additional harms due to his continued detention. He is the primary breadwinner for his family, and his wife and three children have struggled financially and emotionally since his detention. Guevara Decl. ¶¶ 39-40; Saenz Decl. ¶¶ 5, 9–10. He is also unable to care for his son Oscar, who suffered a stroke during surgery to remove a brain tumor in 2021. Guevara Decl. ¶¶ 6, 40; Saenz Decl. ¶ 6. As a result, Oscar suffers from a stutter, periodic seizures, and intense nerve pain. Saenz Decl. ¶ 6. Mr. Guevara helps transport Oscar to and from medical appointments and work. Guevara Decl. ¶¶ 6, 40; Saenz Decl. ¶ 6. He also provides critical emotional support to Oscar when he is struggling or in pain. *Id.* He cannot offer that practical or

emotional support while in detention.

## LEGAL STANDARD

To obtain a temporary restraining order or a preliminary injunction, a movant must show: "(1) [he] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (per curiam) (same standard for TRO). Likelihood of success on the merits is "the most important . . . criterion." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127–28 (11th Cir. 2022).

## ARGUMENT

## I.    MR. GUEVARA IS LIKELY TO SUCCEED ON THE MERITS.

### A.    Mr. Guevara is likely to succeed on the merits of his First Amendment claim.

The Government's extraordinary decision to continue detaining Mr. Guevara violates his First Amendment rights as both (1) a prior restraint and (2) unconstitutional retaliation.

#### 1.    The First Amendment protects Mr. Guevara's livestreaming, recording, and publishing of law enforcement activity.

The First Amendment exists "to protect the free discussion of governmental affairs," *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)), and "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people," *Roth v. United States*, 354 U.S. 476, 484 (1957). Similarly, one primary role of the press is "to serve as a powerful antidote to any abuses of power by governmental officials," *Mills v. Alabama*, 384 U.S. 214, 219 (1966), which may include "a significant amount of verbal criticism and challenge directed at [law

enforcement] officers," *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). Indeed, speech on "public issues . . . is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Mr. Guevara's reporting on the Government's law enforcement activities falls squarely within each of these protections.

In addition, the First Amendment specifically protects the "right . . . to photograph or videotape police conduct," both through "the right to gather information about what public officials do on public property" and the "right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). And the First Amendment also protects the right to livestream such content, for just as "[r]ecording police encounters creates information that contributes to discussion about governmental affairs[, s]o too does livestreaming . . . , often creating its own record." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023); *see also Fields v. City of Phila.*, 862 F.3d 353, 358–59 (3d. Cir. 2017); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

The Government seems to suggest that Mr. Guevara's livestreaming, recording, and publishing is not protected because it identifies law enforcement officers and their vehicles. *See, e.g.*, Ex. 15 at 6. But Eleventh Circuit precedent squarely forecloses this argument, holding that the First Amendment protects identifying officers, from "a member of the press . . . taking photographs of alleged police misconduct," *Bowens v. Superintendent of Miami S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014), to a government critic photographing specific officers, *Abella v. Simon*, 522 F. App'x 872, 873–74 (11th Cir. 2013). Even more explicitly, the Eleventh Circuit has held that the First Amendment protects filming a police officer and "the license plate on [his] cruiser because he had not identified himself," *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1122, 1129 (11th Cir. 2021), and "zoom[ing] in on [a specific officer at a

protest], getting a shot of his name embroidered on his jacket and saying his name out loud," *Toole v. City of Atlanta*, 798 F. App'x 381, 383, 388 (11th Cir. 2019). Thus, under Eleventh Circuit precedent, the First Amendment protects the right to record and broadcast the likenesses, names, vehicles, and license plates of law enforcement officers.

In arguing for Mr. Guevara's continued detention, the Government has also stated that Mr. Guevara reported on undercover officers, *see, e.g.* Ex. 15 at 6, but the First Amendment protects the right to film law enforcement activity even where the law enforcement officer is undercover.[4] Otherwise, any "undercover" exception would swallow the rule, for reporters could never be certain that they are not filming or recording undercover officers. As the Eleventh Circuit explained in *Williamson v. Mills*, "[t]aking photographs at a public event is a facially innocent act," even when those photographs show undercover officers and even where those officers have been the subjects of death threats. 65 F.3d 155, 158 (11th Cir. 1995). Even where the "photographs [of undercover officers] *could* have been used for unlawful activity[,] such as carrying out a[n existing] death threat,"—facts that are not remotely alleged here—that "is not enough to establish" illegality. *Id.*[5] *Cf. Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1220 (10th Cir. 2007) (recognizing

---

[4] It is not clear from the Government's own assertions that Mr. Guevara was reporting on undercover officers, or that he could have known that he was doing so. *See* Guevara Decl. ¶ 17. For example, the Government states that "[o]n February 19, 2025, the respondent filmed officers from the Sheriff's Office . . . *where there was an undercover narcotics investigation*." Ex. 15 at 6 (emphasis added). And that "[o]n April 2, 2025, the respondent . . . filmed *uniformed and plain clothed* officers." *Id.* at 7 (emphasis added). With respect to February 19, a Gwinnett County Sheriff's Office report notes that, far from claiming that information about the case was confidential, a major in charge of the investigation provided his "Communications Unit with a brief overview of the case to share with Mr. Guevera [sic]." Ex. 4 at 7.

[5] Though *Williamson* is a Fourth Amendment case, the Eleventh Circuit specifically cited it with approval when it recognized that "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith*, 212 F.3d at 1333.

that "[p]ublicity of undercover police officers" via TV broadcast is "a matter of public interest" protected by the First Amendment).

An officer's safety concerns do not change the calculus. *See City of Houston*, 482 U.S. at 465 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them.") (footnote omitted). Before the district court in *Smith*, officers stated that "Smith's actions made them nervous and they felt their safety was jeopardized." 1999 U.S. Dist. LEXIS 23875, at *14. Yet, on appeal, the Eleventh Circuit held that Mr. Smith's filming of the officers was nevertheless protected. *Smith*, 212 F.3d at 1333.

### 2.    ICE's continued detention of Mr. Guevara is an unconstitutional prior restraint.

The Government's continued detention of Mr. Guevara violates his First Amendment rights as a prior restraint because it is *specifically* imposed in anticipation of, and to prevent, his future livestreaming, recording, and publishing of law enforcement activity in public. "A prior restraint on speech prohibits or censors speech before it can take place," *Cooper v. Dillon*, 403 F.3d 1208, 1215 (11th Cir. 2005), and is "the essence of censorship," *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931). Courts around the country have recognized that detention "may constitute a 'prior restraint' in some circumstances." *McCormick v. City of Lawrence*, 271 F. Supp. 2d 1292, 1303 (D. Kan. 2003), *aff'd* 130 F. App'x 987 (10th Cir. 2005); *United States v. Moore*, 215 F.3d 681, 685 (7th Cir. 2000) ("an arrest might . . . act as a prior restraint"); *SOB, Inc. v. Cnty. of Benton*, 317 F.3d 856, 866 (8th Cir. 2003) (recognizing that custody of erotic dancers after arrest could constitute prior restraint by preventing later performances). *Cf. O'Donnell v. Knott*, 283 F. Supp. 3d 286, 305 (E.D. Pa. 2017) (the mere "threat[ of] arrest" can constitute prior restraint).

Specifically, where, as here, detention is imposed to stop expression before it occurs, it is a prior restraint. In *Collins v. Ainsworth*, for example, the Fifth Circuit held that a county's "use

14

of . . . driver's license checkpoints" to detain, and in many instances arrest, concert attendees and performers in order to "stop the Concert from taking place" "amounted to an impermissible prior restraint." 382 F.3d 529, 545 (5th Cir. 2004). It was "an indirect (but fully effective) bar" on "First Amendment-protected musical expression and association" before it took place. *Id.; see also Main Rd. v. Aytch*, 522 F.2d 1080, 1089 (3d Cir. 1975) (ban on specific expressive activity—there, talking to press—while in custody constituted prior restraint); *Admiral Theatre v. City of Chicago*, 832 F. Supp. 1195, 1204 (N.D. Ill. 1993) (arrest of "dancers *before* they perform, based on a[n officer's] belief that the content of such performances *will be* obscene" is prior restraint).

Here, by the Government's own account, it has continued to detain Mr. Guevara to ensure that he does not livestream, record, or publish videos of law enforcement officers performing their duties in public—because the Government believes these constitutionally-protected activities constitute a danger to the community.[6] The Government states that the primary reason Mr. Guevara constitutes a danger is that he "filmed" officers and their vehicles, and "post[ed] the videos on his Facebook account[.]" Ex. 15 at 5–6; Ex. 10 at 4 (same). Per the Government, Mr. Guevara must remain in detention so that he does not engage in such journalistic activities going forward.[7]

Because prior restraints bar expression *before* it is even uttered, they are especially disfavored. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (prior restraints do not merely

---

[6] The Government's detention to prevent livestreaming is akin to seeking to block a news station from reporting live. This is particularly concerning because "timing is of the essence in politics," *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring), and "[t]he damage [of a prior restraint] can be particularly great when [it] falls upon the communication of news and commentary on current events," *Neb. Press Ass'n*, 427 U.S. at 559.

[7] The Government also claims that Mr. Guevara's press activity constitutes a danger because, while reporting, he "disregard[ed] traffic signs and livestream[ed] while driving." Ex. 15 at 8. But Gwinnett County dismissed the misdemeanor traffic charges arising from these alleged incidents and released Mr. Guevara on bond while one was still pending. Calmes Decl. ¶¶ 8–9, 11.

"chill[]" speech, but "freeze" it). Accordingly, they are subject "to the most exacting scrutiny." *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). The Government must show that the harm it targets is not only "extremely serious," *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 845 (1978), but also "direct, immediate, and irreparable," *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *see id.* at 726–27 (Brennan, J., concurring); that its "degree of imminence [is] extremely high," *Landmark Commc'ns*, 435 U.S. at 845; and that the restraint comes "in the narrowest terms that will accomplish the pin-pointed objective[.]" *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968).

The Government cannot meet that standard here. Start with the Government's interest. It has no legitimate, let alone compelling, interest in restraining Mr. Guevara from shining a light on law enforcement activity. And attempting to couch this aim in the language of officer safety does not make it any more permissible because identifying officers and vehicles, including when they are undercover, is protected by the First Amendment. *See supra* Argument I.A.1. Moreover, while the Government claims that Mr. Guevara "endangered the safety of undercover officers by publicly posting their identities and vehicle tag numbers," Ex. 15 at 8, it offers no evidence, much less a "solidity of evidence," *see Landmark Commc'ns*, 435 U.S. at 845 (citation omitted), that his reporting in fact caused any harm, much less "direct, immediate, and irreparable damage," *N.Y. Times Co.*, 403 U.S. at 730.[8] Similarly, the Government's suggestion that Mr. Guevara's reporting "compromised investigations" is wholly speculative. Ex. 15 at 8. The Government does not allege, much less offer evidence, that Mr. Guevara disobeyed a law enforcement order or prevented law

---

[8] For four out of the six incidents the Government describes, it states only that Mr. Guevara revealed officers or their vehicles, not that any harm resulted. Ex. 15 at 6–7 (Mar. 3, Apr. 2, May 15, May 20). Of the remaining two, in one, the Government does not even state that Mr. Guevara posted officer identities or vehicles at all, *id*. at 7 (May 17); in the other, it simply speculates that his livestreamed video "rais[e]d safety concerns for the officer," *id*. at 6 (Feb. 19).

enforcement from carrying out operations. *See id*. at 7 (referencing concerns that "his conduct *might* jeopardize the integrity of the investigation" (emphasis added)); Ex. 14 at 2. *Cf*. Ex. 4 at 7 (describing Mr. Guevara filming from outside a designated crime scene and complying with officer's directive not to "come any closer").

Even if the Government were able to demonstrate that Mr. Guevara's press activities result in "direct, immediate, irreparable" harm, keeping him in detention is far from the "narrowest" way to prevent it. The Government could, for example, release Mr. Guevara on the condition that he not reveal officer identities and vehicles.[9] Instead, it is keeping Mr. Guevara in custody and wholly unable to do *any* reporting about law enforcement (or anything else). For this reason alone, Mr. Guevera is likely to succeed on his First Amendment claim.

### 3.    ICE's continued detention of Mr. Guevara is retaliatory in violation of the First Amendment.

Mr. Guevara is also likely to succeed on his First Amendment claim because his detention independently constitutes retaliation for his protected speech. To succeed, Mr. Guevara must show that: (1) he engaged in First Amendment protected activity; (2) the Government took adverse action that would reasonably chill his protected activity; and (3) his speech was a substantial factor motivating the Government's adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). Mr. Guevara readily meets these elements. And the Government cannot show that it would have taken the adverse action even absent Mr. Guevara's protected reporting.

---

[9] In offering this alternative, Mr. Guevara does not concede that it would be constitutional; he notes it merely to show that the Government's current course of action is far from the pin-pointed restriction on speech that the First Amendment requires.

i.    The First Amendment protects Mr. Guevara's livestreaming, recording, and publishing of law enforcement activity.

The First Amendment protects livestreaming, recording, and publishing officers engaged in official duties in public, including disclosing their likenesses, names, cars, and license plates. *See supra* Argument I.A.1.

ii.    The Government Took Retaliatory Action.

The Government's continued detention of Mr. Guevara—and specifically its decision to refuse to release Mr. Guevara on the ground that his reporting is dangerous—constitutes adverse action. It is more than sufficient to chill people of "ordinary firmness" from exercising their First Amendment rights. *See Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005) (recognizing that "since there is no justification for harassing people for exercising their constitutional rights [the effect of any adverse action] need not be great in order to be actionable") (quotation omitted). Indeed, courts around the country have held that placing or keeping an individual in immigration detention constitutes adverse action. *See Bello-Reyes v. Gaynor*, 985 F.3d 696, 702 (9th Cir. 2021) (ICE revoking plaintiff's bond and detaining him shortly after he publicly criticized ICE was adverse action); *Mahdawi v. Trump*, No. 2:25-CV-389, 2025 WL 1243135, at *10 (D. Vt. Apr. 30, 2025) (petitioner's immigration detention was adverse action); *Ercelik v. Hyde*, No. 1:25-CV-11007, 2025 WL 1361543, at *11 (D. Mass. May 8, 2025) (same); *Mohammed H. v. Trump*, No. 25-1576, 2025 WL 1334847, at *3 (D. Minn. May 5, 2025) ("Being detained by ICE interferes with Petitioner's ability to speak, and it is reasonable that losing one's freedom would chill an ordinary person from continuing to speak."); *Aditya W. H. v. Trump*, No. 25-cv-1976, 2025 WL 1420131, at *11 (D. Minn. May 14, 2025) (same). *Cf. Smith v. Governor for Ala.*, 562 F. App'x 806, 815 (11th Cir. 2014) ("prison transfers qualify as adverse actions for purposes of retaliation").

iii.    Mr. Guevara's Expression Was a Substantial Motivating Factor.

Mr. Guevara need only show that his protected expression was a substantial factor behind the Government's retaliatory action. *See Mt. Healthy*, 429 U.S. at 287; *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). Going a step further, the evidence here shows that Mr. Guevara's protected activity was the primary, if not sole, motivation. This is clear from what the Government has repeatedly and consistently said: that Mr. Guevara poses a danger to the community, and therefore must remain in detention, *specifically because* he livestreams, records, and publishes video of law enforcement activity. *See, e.g.*, Ex. 15 at 5–7; Ex. 14 at 2. Indeed, the Gwinnett County Sheriff's Office's report, which constitutes the Government's primary evidence in seeking to keep Mr. Guevara detained, summarizes Mr. Guevara's supposed dangerousness as follows: "Mario Guevara's behavior demonstrates a consistent pattern of pursuing and filming law enforcement activities." Ex. 4 at 10; *see also* Guevara Decl. ¶ 19 (describing ICE officers admitting that he is a "headache" and that his detention means they can operate without him following them).

The Government attempts to recast Mr. Guevara's reporting as unsafe or disruptive, but the specifics it offers amount to Mr. Guevara reporting on law enforcement officers engaged in their duties in public, just as any live news broadcaster does. *See* Ex. 15 at 6–8 (describing "respondent film[ing] officers" and "post[ing] the encounter" on February 19; "filming" officer and vehicle and "post[ing] this video" on March 3; "film[ing] uniformed and plain clothed officers" and "vehicles and . . . license plates" and "post[ing] the video" on April 2; "livestream[ing] the scene" and "post[ing] the video" on May 15; "livestream[ing a] video that the respondent posted on his Facebook page" that law enforcement reviewed on May 17; and "livestreaming from his phone" and "post[ing] the video" on May 20). *Cf.* Guevara Decl. ¶¶ 14–18, 20 (describing Mr. Guevara's reporting practices). Mr. Guevara's protected journalistic activities are therefore the crux of the Government's argument for detention.

iv.    <u>The Government Has Not Met and Cannot Meet Its Burden.</u>

Because Mr. Guevara has established the three factors above, the burden shifts to the Government to show that, absent retaliatory animus towards him for his reporting, it would still have refused to release him. *See Mt. Healthy*, 429 U.S. at 287; *DeMartini*, 942 F.3d at 1289. The Government cannot meet that burden here.

Mr. Guevara is a devoted husband and father, and a pillar of his community. *See supra* Factual Background I, VI. The Immigration Court carefully considered all of the statutorily-prescribed factors, and determined that he is neither a danger nor a flight risk. Ex. 6 at 7. Even the charges briefly lodged against him—which have all been dismissed—were for non-violent, misdemeanor offenses. *Cf. United States v. Gomez*, No. 6:20-CR-80-RBD-DCI, 2025 WL 1717779, at \*3 (M.D. Fla. June 9, 2025) (release "would not pose a danger to the community" where defendant's crime was nonviolent and he had no prior criminal history); *United States v.* June 9, 2025) (release "would not pose a danger to the community" where defendant's crime was nonviolent and he had no prior criminal history); *United States v. Snipes*, No. 4:21-CR-21-CDL-MSH, 2023 WL 5610396, at \*4–5 (M.D. Ga. 2023) (defendant entitled to release where underlying offense was nonviolent and he had no prior criminal record); *United States v. Asher*, 467 F. Supp. 3d 1285, 1292–93 (N.D. Ga. 2020) (granting release because underlying offense did not involve harmful "physical contact" and defendant had no prior criminal history). And, even while those charges were pending, both DeKalb and Gwinnett Counties released Mr. Guevara on bond. *See* Ex. 2; Calmes Decl. ¶ 9.

Based on its filings to date, the Government's primary argument to the contrary is likely to be that Mr. Guevara's reporting itself is dangerous enough to justify detention because it purportedly endangers undercover officers, compromises investigations, and involves reckless

behavior. As discussed above, the Government does not actually allege that Mr. Guevara's reporting endangered undercover officers or impeded investigations. *See supra* Argument I.A.2. And any argument that the Government would have pursued detention solely on the basis of Mr. Guevara's purportedly reckless behavior—either at the June 14, 2025 protest or while driving on May 13 and May 20, 2025—is belied by DeKalb and Gwinnett Counties' decisions to drop all related criminal charges (and to order Mr. Guevara released on bond even while they were pending). *See* Moreno Decl. ¶ 6 ("Government appeals of bond grants, especially stays are . . . generally reserved for cases involving serious criminal conduct, clear evidence of danger, or major flight risk. I have not encountered such an appeal where no criminal charges are pending."); Baxter Decl. ¶¶ 7 ("OPLA appeals of bond grants typically only happen where OPLA is contending that a judge did not have jurisdiction . . . or that there was overwhelming proof in the record of a Respondent being a danger to the community, specifically, criminal convictions.").

The Government may also argue that it would have pursued Mr. Guevara's detention even in the absence of his journalism because he purportedly possesses a firearm. But as the IJ determined, the Government has never established that Mr. Guevara possesses a firearm, let alone unlawfully. Ex. 6 at 4. Moreover, it is exceedingly rare for the Government to pursue detention solely based on a claim that an individual possesses a firearm, particularly without any pending charges, much less a conviction—further suggesting that this fact would not have been the basis for the Government to continue detention on its own. Moreno Decl. ¶ 4 ("[I]t is highly unusual for the government to claim a detainee is a danger to the community . . . solely because a firearm is present in the home, without any evidence of misconduct involving the weapon."); Baxter Decl. ¶¶ 3, 6, 9 (describing handling more than 1,000 bond cases; recalling only one instance where Government relied on access to a gun, but lost and did not appeal; and describing "Guevara's case

… as unique in that OPLA has file an appeal where . . . there are no criminal convictions, just intimations that the individual has access to a weapon"). Indeed, the Government barely addresses this argument in its filings—devoting *one paragraph* of a five-page legal argument to this point and, even in that paragraph, tying the relevance of the purported firearm possession to Mr. Guevara's "repeated encounters with law enforcement," *i.e.* his reporting activity—again belying any argument that it was an independent basis for continuing detention. Ex. 15 at 9. The Government thus cannot meet its burden to overcome Mr. Guevara's retaliation claim.

### B.    Mr. Guevara is likely to succeed on his substantive due process claim.

The Fifth Amendment forbids the Government from depriving any person of liberty without due process, and "applies to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 690, 693 (2001). Immigration detention, which is civil, must "bear[] a reasonable relation to the purpose for which the individual [is] [detained]" and cannot be "[]punitive in purpose and effect." *Id*. at 690 (first citation omitted). There are only two legitimate purposes for immigration detention: mitigating flight risk and preventing danger to the community. *See id*.; *accord Sopo v. U.S. Att'y Gen*., 825 F.3d 1199, 1210 (11th Cir. 2016), *vacated as moot*, 890 F.3d 952 (11th Cir. 2018). Neither purpose is served by Mr. Guevara's continued detention.

As demonstrated above, the Government continues to detain Mr. Guevara for patently *illegitimate* reasons: to punish him for his past speech and to suppress it in the future. *See supra* Argument I.A.3. Civil detention cannot be a "mechanism for retribution," *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (cleaned up), because "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives," *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) (cleaned up). Thus, for the reasons the Government's continuing detention of Mr. Guevara violates the First

Amendment, it also violates the Fifth Amendment. *See Mahdawi*, 2025 WL 1243135, at *11 (noting that "[t]he same evidence that supports [petitioner's] First Amendment claim supports his Fifth Amendment claim"); *see also Mohammed H. v. Trump*, No. 25-CV-1576, 2025 WL 1692739, at *5 (D. Minn. June 17, 2025) ("Punishing Petitioner for protected speech . . . is abusive and does not reflect legitimate immigration detention purposes.").

Even if this Court does not agree that the Government has evidenced punitive intent, Mr. Guevara's continued detention violates substantive due process because he is neither a danger to the community nor a flight risk, as determined by the Immigration Court. Prior to his June 14, 2025 arrest, Mr. Guevara had "no other criminal history in his twenty years of residing within the United States," and all criminal charges levied against him since June 14 have since been dismissed. Ex. 6 at 5–6. Indeed, the IJ found that he "in fact has a history of cooperation with law enforcement agencies" and "of following the laws of the United States, as he legally entered the U.S. with a B1 visa, he has employment authorization and a social security number so that he can legally work in the United States, and he has a history of paying his taxes." *Id*. at 6. He lives with his wife and three children, two of whom are U.S. citizens, and one of whom requires long-term medical care and for whom he provides critical assistance. *See supra* Factual Background I, VI. He is a valued member of his community, attending church, regularly volunteering to assist those in need, *see id*, and "assist[ing] law enforcement when able," Ex. 6 at 5. The record is replete with declarations from family members, civic and religious leaders, fellow church members, and friends in Mr. Guevara's community, who all attest to his exemplary character. *See generally* Ex. 7. As such, Mr. Guevara's detention bears no "reasonable relation" to a legitimate government purpose and is unlawful. *Zadvydas*, 533 U.S. at 690 (citation omitted).

## II.    MR. GUEVARA IS SUFFERING IRREPARABLE HARM.

"[A]n ongoing violation of the First Amendment constitutes an irreparable injury." *FF Cosms.*, 866 F.3d at 1298 (citing *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)). "A delay of even a day or two may be of crucial importance," *President and Comm'rs of Princess Anne*, 393 U.S. at 182 (citation omitted), particularly "when public interest in the matters discussed would naturally be at its height." *Wood v. Georgia*, 370 U.S. 375, 392 (1962) (citation omitted). Here, the very purpose of Mr. Guevara's continued detention is to silence, restrict, and chill his protected speech, now and in the future. Every day he is in detention, he is prevented from reporting—compounding the very retaliatory and punitive harm he is challenging through this litigation.

In addition to the loss of his First Amendment rights, Mr. Guevara faces irreparable injury to his liberty. *See Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018) ("Any amount of actual jail time is significant[] and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." (cleaned up)).

Mr. Guevara's isolation from his family and community has also resulted in enormous hardship, further constituting irreparable harm. *See, e.g.*, *Jimenez v. Napolitano*, No. 12-CV-3558, 2012 WL 3144026, at *7 (N.D. Cal. Aug. 1, 2012) (separation from family, *inter alia*, to constitute irreparable harm); *Borjas-Calix v. Sessions*, No. 16-CV-685, 2017 WL 1491629, at *3 (D. Ariz. Apr. 26, 2017) ("separation from family and loss of employment" constitutes irreparable harm). Mr. Guevara cannot see or support his family, causing him serious emotional distress and imposing on them the painful toll of being forcibly separated from him. *See supra* Factual Background VI. He is unable to care for his son, who relies on him for physical and emotional support. *Id.* And his family and business have struggled financially since his detention. *Id*.

III.    **THE EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN MR. GUEVARA'S FAVOR.**

Where the government is the opposing party, the balance of the equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, they overwhelmingly favor Mr. Guevara, who faces enormous irreparable injury if an injunction is not granted, *see supra* Argument II, while the Government "has no legitimate interest in" violating the Constitution. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272–73 (11th Cir. 2006). The public also has "no interest" in the Government spending "time, money, and effort in attempting to [continue a practice] that may well be held unconstitutional," *id.* (citation omitted)), and is instead best served by "curtailing unlawful executive action," *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (finding "substantial public interest in having governmental agencies abide by the federal laws" (cleaned up)).

Where suppression of speech is at issue, unconstitutional government action "harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010)). And it serves as an "a particularly effective deterrent" to others who would otherwise engage in similar speech. *See Ragbir v. Homan*, 923 F.3d 53, 71 (2d Cir. 2019). If the Government's efforts to detain Mr. Guevara—the first reporter to be retaliatorily detained by ICE during this administration—because of his livestreaming are successful, then any journalist, including citizen reporters, would reasonably fear detention or other official retaliation for similar journalism. Zamora Decl. ¶¶ 20–22.

## CONCLUSION

For all these reasons, this Court should issue a temporary restraining order and/or preliminary injunction to enjoin the Government from continuing to detain Mr. Guevara.

Dated: August 21, 2025                          Respectfully submitted,

                                                */s/ Andres Lopez-Delgado*
Scarlet Kim*                                    Andres Lopez-Delgado (GA Bar # 552876)
Vera Eidelman*                                  Cory Isaacson*
Tyler Takemoto*                                 American Civil Liberties Union
American Civil Liberties Union Foundation       Foundation of Georgia
125 Broad Street, 18th Floor                    P.O. Box 570738,
New York, NY 10004                              Atlanta, GA 30357
scarletk@aclu.org                               (770) 415-5490
veidelman@aclu.org                              adelgado@acluga.org
ttakemoto@aclu.org                              cisaacson@acluga.org

Michael K.T. Tan*                               Clare R. Norins (GA Bar # 575364)
American Civil Liberties Union Foundation       Ward Evans* (GA Bar # 487147)
425 California Street, 7th Floor                First Amendment Clinic
San Francisco, CA 94104                         University of Georgia School of Law
(808) 490-3806                                  P.O. Box 388
m.tan@aclu.org                                  Athens, Georgia 30603
                                                (706) 542-1419
Giovanni Diaz (GA Bar # 246622)                 cnorins@uga.edu
Jessica Calmes (GA Bar # 202719)                ward.evans@uga.edu
Zachary Gaeta (GA Bar # 507940)
Diaz & Gaeta Law, LLC                           Donald F. Samuel (GA Bar # 624475)
2400 Herodian Way SE, Suite 275                 Garland, Samuel & Loeb, P.C.
Smyrna, GA 30080                                3151 Maple Drive
(678) 503-2780                                  Atlanta, GA 30305
(404) 341-9370                                  (404) 262-2225
diaz@dglawga.com                                dfs@gsllaw.com
calmes@dglawga.com
gaeta@dglawga.com                               *Pro hac vice applications forthcoming

                                                *Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and correct copy of the foregoing Memorandum of Law In Support of Emergency Motion and all supporting documents to be served on all counsel of record by filing same through the Court's CM/ECF system.

Dated: August 21, 2025                          Respectfully submitted,

                                                */s/ Andres Lopez-Delgado*
                                                Andres Lopez-Delgado (GA Bar # 552876)