UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| Mario Alexander GUEVARA,<br><br>*Petitioner*,<br><br>v.<br><br>George Sterling, in his official capacity as Director of the Atlanta Field Office, Immigration and Customs Enforcement *et al.*,<br><br>*Respondents*. | Case No. 2:25-cv-00104-LGW-BWC |

## DECLARATION OF MARIO ALEXANDER GUEVARA

I, Mario Alexander Guevara, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I hold citizenship from El Salvador. I worked as a photojournalist for *La Prensa Gráfica*, one of the two largest newspapers in the country, before coming to the United States. In 2004, I fled El Salvador with my family because of violence and harassment I experienced due to my work as a journalist. That year, I lawfully entered the United States on a B-1 visa.

3. I have lived in the United States since 2004. I live in Lilburn, Georgia with my wife and three children, two of whom are U.S. citizens and one of whom is a recipient of Deferred Action for Childhood Arrivals ("DACA"). My mother, brother, and sister are also U.S. citizens, and my brother served in the U.S. military, including in Afghanistan.

4. I applied for relief from removal in 2007. An Immigration Judge denied my application

1

in June 2012, and I appealed to the Board of Immigration Appeals ("BIA"). However, in December 2012, the BIA granted a joint motion by myself and the Government to administratively close my removal proceedings, which effectively authorized me to continue living and working in the United States. Since that time, and until this summer, the Government has not sought to remove me from the United States.

5. I am legally authorized to live and work in the country. I have a social security number and have paid taxes as required by law. I am also eligible for lawful permanent residency. I am the beneficiary of an I-130 Petition for Alien Relative, filed by my 21-year-old U.S. citizen son. Upon approval of the I-130 Petition, I will have a visa immediately available to me and will be eligible to file an I-485 Application for Adjustment of Status to obtain a Green Card.

6. I am dedicated to my community. I attend a church in the Atlanta area, have taught Sunday school for teenagers, assist elderly members of the community, and give my time, skills, and resources to those in need. One of my friends is disabled and blind, and I regularly visit her, take her to my house, help her move around, feed her, and carry her in my arms if necessary. I am also a key caretaker for my 21-year-old U.S. citizen son, who suffers speech issues, recurring seizures, and intense nerve pain after suffering a stroke during surgery to remove a brain tumor. I regularly drive him to and from medical appointments and work.

**My Journalism in the United States**

7. Since coming to the United States, I have continued working as a journalist. For many years, I worked as a reporter for *Mundo Hispanico*, the state's largest Spanish-language newspaper.

8. In 2024, I launched my own digital news organization MG News, which I run and own. MG News publishes multimedia news on a broad range of topics, including local, national, and international events, sports, and entertainment. MG News's reporting focuses on the Hispanic

community in the Atlanta area and what we believe is most relevant to it, but it is also a source of news for people outside of the Atlanta area, and even outside the state of Georgia. MG News currently employs five people, spread between the United States and El Salvador. However, I am the primary newsgatherer at MG News.

9. MG News publishes stories and other content on its website and its Facebook page, which has over 110,000 followers. I also regularly publish MG News content on my Facebook page, which has over 780,000 followers. My livestream reporting for Facebook constitutes the heart of what MG News does, in line with its slogan "Lo Vio Primero Aqui," which means "You Saw It Here First."

10. As part of my reporting, I frequently livestream video footage of what I observe. Livestreaming enables me to instantly broadcast video footage across multiple social media platforms. Livestreaming has become a standard journalistic practice and allows journalists to instantaneously deliver news to their audiences, along with the journalist's real-time observations and commentary. When covering rapidly unfolding events, livestreams are often the quickest and most impartial way for audiences to obtain information about what is unfolding in their communities.

11. I take my job as a journalist very seriously and I care deeply about reporting timely, unbiased news to the community. When covering law enforcement, I do not approach my reporting with a particular bias or agenda, and I have respect for the work that law enforcement officers do. In fact, I frequently work alongside law enforcement. I regularly ride along with officers from multiple police departments and interview them to better educate my viewers about law enforcement's perspective.

12. Law enforcement's involvement in immigration enforcement and in public protests is highly relevant to my audience, and MG News frequently covers law enforcement action in the Atlanta area and throughout the state of Georgia. My reporting on MG News reaches hundreds of thousands

of viewers, and while they value all of my reporting, the focus of MG News for both myself and my followers is immigration and law enforcement-related news. I consider my livestream and video reporting on law enforcement activity to be some of my most important work. Through my livestreaming and reporting, I strive to offer accurate and timely information to the public, which I hope informs people's understanding of what law enforcement does and helps to hold the government accountable to public opinion.

13. Among the most important stories I have covered is the false arrest of Ximena Arias-Cristobal in Dalton, Georgia. To ensure that my audience received information about the story firsthand and as quickly as possible, I drove to the Stewart Detention Center and livestreamed an interview with Ximena immediately upon her release. Another important story I covered was the murder of Laken Riley—my coverage included several livestreamed interviews in the aftermath of her murder.

14. When engaged in livestreaming or recording of law enforcement activities, I follow standard reporting practices and strive to maintain my independence as a journalist. I always carry my press credentials and I always keep my car marked with MG News emblems. I maintain a safe distance from my subjects, including law enforcement officers, suspects, and vehicles. I do not physically or verbally interfere with or intervene in law enforcement action. I always follow police orders. I've been reporting primarily in Gwinnett County for years and I personally know almost all of the officers.

15. When livestreaming or recording, I document what is visible to me of officers engaged in their official duties and narrate what I observe. I mostly do so from public streets, sidewalks, and parks. I only go on private property when invited to do so by residents of that property. I always keep a safe distance from the officers.

16. When reporting while driving, I always drive with both hands. My phone, which I use

for livestreaming, is safely attached to a mount on the windshield under the rearview mirror. I maintain a reasonable distance from the cars in front of me.

17. When determining what to report on or film, I only go after leads provided by my followers, who alert me to likely law enforcement activity, often with a focus on immigration law enforcement. And I only film activity occurring in public. I don't know who the law enforcement officers or agencies are until I arrive at the scene, but I am there because another member of the public has already told me that they think law enforcement activity is going on. Most of the time, my subjects are ICE officers, but sometimes they are other law enforcement officers.

18. I respect the law and the work that law enforcement officers do. I do my work; they do their work. I've been conducting my journalism in the same way for 20 years, including under the Obama, Biden, and both Trump administrations.

19. ICE officers have admitted to me while transporting me between detention centers that I am a "headache" for them and that they can now conduct their operations without anyone following them.

20. When covering protests, I clearly distinguish myself as a journalist acting independently of protestors. I wear a vest with an easily readable label identifying me as a member of the press. I wear a press credential and verbally identify myself as a journalist. I do not engage in protest activities when newsgathering and follow standard journalistic protocol: maintaining a safe distance from law enforcement officers and complying with their reasonable instructions while still exercising my legal right to observe and engage in newsgathering of what I see in public places.

21. My reporting has earned me multiple professional accolades, including Southeast Regional Emmy Award nominations in 2019, 2021, and 2023, and a Southeast Regional Emmy Award in 2021 for my work at *Mundo Hispanico*. In 2021 and 2022, the Georgia Hispanic Chamber of

Commerce recognized me as one of the 50 Most Influential Latinos in Georgia ("Latinos Influyentes en Georgia"). In 2019, my reporting was the subject of a *New York Times* documentary titled "Boca del Lobo."

22.     Prior to my June 14, 2025 arrest while reporting on law enforcement's response to a protest, I had never been arrested.

**The Incidents in the Gwinnett County Sheriff's Office Report**

23.     The Gwinnett County Sheriff's Office report describes incidents on February 19, March 3, April 2, May 15, May 17, and May 20 of this year.

24.     I recall filming law enforcement activity on February 19, and recall speaking with the officers. The description in the report makes clear that I did not violate the law: I arrived at a crime scene, told law enforcement officers that I was press, filmed from my public vantage point, complied with law enforcement orders not to come any closer, and posted video that only showed an officer in his mask. I also recall removing that video at the request of the Sheriff's Office on February 21.

25.     I recall observing law enforcement activity on March 3 as a result of a tip from followers. Followers had reported to me that they had seen ICE officers dressed like ICE, and that someone believed they had seen "ICE" on officers' clothing. I arrived expecting to see ICE officers.

26.     I recall filming law enforcement activity on April 2. Residents of an apartment complex reached out to me to report ICE operations. I arrived and was only there for a short time recording a livestream and left after confirming it was not an ICE operation. As the Report states, a lieutenant contacted me afterwards and asked me to take down the video. I promised to review the video and remove it if it showed any officer's face. I reviewed the video and all the officers' faces were masked, so I did not remove it.

27.     I recall interacting with law enforcement officers on May 15. I arrived because of a tip

6

about ICE activity. I explained that to the officers, and an officer confirmed that they were not ICE. I left after confirming this information.

28. I recall the May 17 incident. As I was approaching an intersection, the light turned red more quickly than I expected. I believed it was safer to continue driving through the intersection than to stop suddenly. My phone was attached to the mount in the car as I was driving.

29. I recall filming law enforcement activity on May 20. I responded to the scene because my followers reported seeing ICE agents with ICE emblems on their clothing. I do not recall removing the camera from the mount while driving but only flipping the camera around. I do not recall driving through a stop sign.

**The Impact of My Detention**

30. My ongoing detention has taken a great toll on me. I am currently detained in solitary confinement, so I am forced to remain alone in my cell for 22 hours a day. The cell is tiny. I have no contact with any of the other detainees. I only get two hours outside the cell. I am taken to another bigger cell that looks like a dog crate where I can see the sky and breathe fresh air. The isolation area is filled with individuals with disciplinary issues and then myself.

31. I believe keeping me in isolation is excessive and punitive. I have nightmares. My sleep routine is completely off. I feel agitated even when speaking to my family. I'm having panic attacks that feel like dreams.

32. I was extorted while detained at the Federal Correctional Institution in Atlanta. It happened very fast, beginning with the first day of my arrival, on July 7. Around 5 PM that day, I was put in an area that I was told was for ICE detainees. Many people started recognizing me. I put my things down, and an officer told me I was free to walk around outside my cell. I walked out and started speaking to the ICE detainees. I went out to the basketball court, and all the ICE detainees surrounded

me to talk. Someone came up and told me the "boss" wanted to talk to me. I didn't know what that meant, so I followed him. I assumed it was the head of prison. But they took me to a group of individuals exercising. One of them asked me who I was. I responded why. They asked if I was a police officer, and I said no. About an hour later, an individual came up to me and said that he knew I was a reporter and that I needed to pay for my safety, $60 a day, or that he would hurt me. I was able to contact my family and ask them to pay the money.

33. The next day, July 8, I was threatened again after breakfast. I was able to contact my family and ask them to pay again. I also told my daughter that I was being extorted and asked her to contact my attorneys. ICE came and transported me to Folkston on July 9.

34. As a professional journalist, I care deeply about keeping my communities informed. Given that I am the owner and primary journalist of MG News, I know my continued detention has greatly hindered MG News' newsgathering operations. I cannot help with producing articles and posts, communicating with sources, and guiding the other reporters at MG News. I have a wide network of contacts from my many years as a trusted local journalist, through which people reach out to me, and no other employee at MG News has the same deep community ties. Furthermore, because I cannot livestream law enforcement activity while detained, MG News's audience no longer has a key source of information that many people in my community relied upon.

35. My detention has also impacted MG News financially. It is generating less income, and there are more and more costs the longer I am detained.

36. Although I intend to continue my reporting when I am released, I honestly do fear continuing my job. It is clear that my lack of citizenship makes me vulnerable to being detained again for doing my job. I think I'll need to start preparing other individuals that are citizens to follow leads about law enforcement. It breaks my heart that I have to make this change after doing this work for so

many years. My mission is to follow these leads and to keep the community informed. But with everything that's happened, I'm not confident that there are precautions that I can take if the government really wants to use its power to retaliate against me. This has really opened my eyes and broken my heart.

37. At the same time, I've received cards and messages of support from members of law enforcement. An officer friend of mine just helped my family renew the tags on all of our vehicles.

38. Above all, I am worried about my family. Being separated from them has been extremely difficult for me.

39. My ongoing detention has placed my family under significant financial strain. I am the primary breadwinner for my family, and because I am unable to work, I am unable to provide them income from my reporting that helps sustain their living costs. My son Oscar has had to pick up additional work to try to make ends meet, but without the generosity of fellow church members and friends and supporters that have given to our family's GoFundMe, I do not believe our family would be able to pay our bills or cover basic necessities.

40. My detention has also prevented me from providing the day-to-day physical and emotional support my family and community rely upon. I cannot provide the daily guidance my family has come to rely on. For example, since my arrest, I have been unable to provide my 21 year-old son, Oscar, with the support he needs to attend work and medical appointments since his brain surgery. I have also been unable to help my close friend who is disabled and blind, with various needs that arise around the house, including helping with her mobility and ensuring she has the food she needs.

41. On two separate occasions, ICE officers have informed me that the longer I fight the case, the longer I will be detained. I believe that the goal of the government is to deport me. The first time was when I was being transported from the FCI to Folkston on June 10. The second time was

when I was informed that my bond wasn't accepted. I responded that I was already aware of that fact, and the ICE Officer responded that my appeal would take five or six months and that I really needed to consider what I should do. I interpreted this response as a warning or a threat.

Despite reasonable diligence, I, Giovanni Diaz, was unable to conduct an in-person meeting with Mr. Guevara prior to filing. However, on August 20, 2025, I had a video conference with Mr. Guevara in which I read the above Declaration. Mr. Guevara confirmed the accuracy and truthfulness of the factual statements contained therein, and authorized me to electronically affix his signature to the document.

Executed this 20th day of August

                                                                              */s/ Giovanni Diaz*

                                                                              Giovanni Diaz

                                                                              */s/ Mario Guevara*

                                                                              Mario Guevara