# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# WAYCROSS DIVISION

|   |   |
|---|---|
| **MARIO ALEXANDER GUEVARA,** <br><br> Petitioner, <br><br> v. <br><br> **WARDEN, FOLKSTON ICE PROCESSING CENTER, et al.,** <br><br> Respondents. | No. 5:25-cv-86-LGW-BWC |

## BRIEF OF PROPOSED AMICUS CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF PETITIONER ON THE ISSUE OF JURISDICTION

Allyson Veile (Georgia Bar No. 620066)
 *Counsel of Record for Amicus Curiae*
Gabriel Rottman*
Lisa Zycherman*
Mara Gassmann*
REPORTERS COMMITTEE FOR
 FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
aveile@rcfp.org

*Of Counsel*

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The Reporters Committee for Freedom of the Press ("Reporters Committee") is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. It regularly files in state and federal courts in Georgia and elsewhere on issues of First Amendment significance. *See, e.g.*, Br. of Amici Curiae Reporters Comm. for Freedom of the Press, et al., *Bd. of Regents of the Univ. Sys. of Ga. and Campaign for Accountability v. Consumer Credit Rsch. Found.*, Nos. S17G1677 / S17G1676 (Ga. Jan. 29, 2018); Br. of Amici Curiae Reporters Comm. for Freedom of the Press, et al., *Callahan v. United Network for Organ Sharing*, No. 20-13932 (11th Cir. Jan. 27, 2021); Br. of Amici Curiae Reporters Comm. for Freedom of the Press, et al., *Ozturk v. Trump*, No. 25-1019 (2d Cir. Aug. 25, 2025).[1]

The accompanying brief, which includes information that the Reporters Committee believes will aid the Court in its decisional process, is submitted in response to the Court's order directing the parties to file supplemental briefs on the limited question of jurisdiction. The Reporters Committee has an interest in ensuring that the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, is not interpreted and enforced in a manner that hinders or dissuades the press from gathering and reporting the news and writes to underscore the

---

[1] The Reporters Committee for Freedom of the Press declares that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person, other than amicus and its counsel, contributed money intended to fund the preparation or submission of this brief.

1

extraordinary chilling effect on newsgathering and reporting in the public interest were courts to accept the government's proposed interpretation of the INA's jurisdiction-stripping provisions.

## INTRODUCTION

The government's proposed interpretation of the jurisdiction-stripping provisions of the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. §§ 1226(e) and 1252(g), would grant the executive effectively unreviewable discretion to detain non-citizen journalists, regardless of a journalist's claim that his reporting led to his detention, until an order of removal is entered and a petition for review can be filed.  If credited, this interpretation would create a potent means of suppressing newsgathering and reporting by disfavored journalists, including those publishing perceived criticisms of public officials or their policies.

In this case, Petitioner Mario Guevara is a citizen of El Salvador who resides in Lilburn. Pet. ¶¶ 34-35.  He previously reported for *Mundo Hispanico*, a Spanish-language Atlanta newspaper, *id.* ¶ 24, before founding his own digital news organization, MG News, which distributes its reporting online, including through Facebook.  *Id.* ¶¶ 25-26.  On June 14, 2025, Guevara was arrested in the course of observing and recording a public protest.  *Id.* ¶¶ 38-42. Two days later, a DeKalb County magistrate court ordered Guevara released on bond, but he remained detained by the county because ICE lodged a detainer against him.  The day after the DeKalb court issued its order, the Gwinnett County Sheriff's Office filed three misdemeanor charges in connection with actions he allegedly took in the course of newsgathering.  Pet. ¶¶ 46-49.  Guevara was then transferred into ICE custody on June 18, 2025.  All charges in DeKalb County filed in connection with Guevara's presence at the protest were dropped in June 2025, and, in July 2025, all three of the misdemeanor traffic charges were dropped by Gwinnett

2

County. Guevara has now sought habeas relief, alleging that his detention violates his First and Fifth Amendment rights.

The government, however, argues that regardless of Guevara's claimed constitutional violations, this Court simply has no jurisdiction to entertain his petition. The government is mistaken, and amicus submits two additional arguments in support of the Court's jurisdiction in this case.

First, crediting the government's arguments and denying jurisdiction would give the government, in the words of another district court that recently addressed similar jurisdiction-stripping arguments, "practically limitless, unreviewable power to detain individuals for weeks or months, even if the detention is patently unconstitutional." *Öztürk v. Trump*, 779 F. Supp. 3d 462, 486 (D. Vt. 2025). The predictable consequence of adopting the government's interpretation would be to chill a vast amount of speech, especially by non-citizen journalists fearful that hard-hitting reporting on sensitive topics could lead to their detention.

Second, adopting the government's interpretation of the INA would cause concrete harms to specific types of newsgathering and reporting. There are many non-citizen journalists in the United States, and they perform public interest newsgathering and reporting every day. Indeed, they are often uniquely situated to report on certain topics and communities. They have special linguistic, cultural, geographic, and other knowledge that makes their reporting particularly valuable. To the extent they can be detained at will while engaged in that reporting, the absence of speedy judicial review would mean that specific news beats—immigration enforcement, for instance—could be chilled more than others. That presents a particularly insidious form of viewpoint discrimination.

For these reasons, amici urge this court to reject the government's jurisdiction-stripping arguments and find that it may consider the merits of Guevara's petition.

## ARGUMENT

I. **The government's jurisdiction-stripping arguments, if credited, would chill constitutionally-protected newsgathering and reporting.**

The government is claiming unfettered power to detain non-citizens, even when such detention is based on First Amendment-protected speech, without any immediate judicial recourse. That is not the law, and it is essential that federal district courts be able to quickly entertain a habeas petition alleging the retaliatory detention of a non-citizen journalist. Anything less would allow the executive branch to silence disfavored non-citizen journalists through unconstitutional detentions, without any review of their constitutionality until a final removal order is entered and a petition for review can be filed.

Permitting the government to detain a non-citizen without any judicial recourse as it seeks removal would violate a first principle of our constitutional order—that where there is a constitutional wrong, there must be a remedy. *Marbury v. Madison,* 5 U.S. 137, 163 (1803) ("[W]here there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded" (quoting 3 William Blackstone, Commentaries on the Laws of England at 23)); *see also* 28 U.S.C. § 2241(c)(3) (providing jurisdiction to extend writ of habeas corpus to those "in custody in violation of the Constitution"). After all, the constitutional core of habeas is to preserve a "means to secure *release* from unlawful detention," *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020), including unconstitutional detention.

The government nevertheless urges this Court to decline to find jurisdiction and thereby functionally prolong Guevara's detention until his removal proceedings have concluded. Because "each passing day" speech is burdened is a new infringement on the public's and the

press's right to speak, that result would be intolerable under the First Amendment. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 580 (1976). But as a district court in Vermont that recently considered similar arguments rightly held, such a result is clearly not required by the jurisdiction-stripping provisions of the INA on which the government relies. *Öztürk*, 779 F. Supp. 3d at 480–86. Namely, 8 U.S.C. § 1226(e) does not "limit habeas jurisdiction over constitutional claims," *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020), and § 1252(g) does not strip courts of jurisdiction to review claims for relief arising from detention.

Any other conclusion would bring the INA into direct conflict with both the First Amendment and the Suspension Clause. The Supreme Court has cautioned that where "Congress intends to preclude judicial review of constitutional claims, its intent to do so must be clear," and has accordingly been hesitant to read the INA's jurisdiction-stripping provisions as precluding review of constitutional challenges. *See Demore v. Kim*, 538 U.S. 510, 517 (2003) (finding 8 U.S.C. § 1226(e) did not preclude jurisdiction where habeas petitioner brought constitutional challenge to statute authorizing his detention without bail). The cases on which the government relies—none of which involved claims arising from detention in violation of the First Amendment[2]—are not to the contrary, as Petitioner correctly notes in his supplemental brief. *See* Suppl. Mem. of Law in Supp. of Mot. For Prelim. Injunction at 8–10 & n.10–13.

And as the Supreme Court in *Reno v. American-Arab Anti-Discrimination Commission*, 525 U.S. 471 (1999) ("*AADC*"), underscored, there is significant danger in reading § 1252(g) to bar judicial review arising from unconstitutional *detention*. That case stands for the narrow

---

[2]   For example, *Alvarez v. U.S. Immigration & Customs Enforcement*, 818 F.3d 1194 (11th Cir. 2016), involved a challenge to detention based on allegedly false statements by government officials to prolong the petitioners' detention. *Gupta v. McGahey*, 709 F.3d 1062 (11th Cir. 2013), involved claims arising from alleged Fourth and Fifth Amendment violations. And in *Camarena v. Director, Immigration & Customs Enforcement*, 988 F.3d 1268 (11th Cir. 2021), the court addressed claims for provisional status waivers under the INA.

proposition that "[w]hen an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." *Id.* at 491–92.  Thus, "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his *deportation*," *id.* at 488 (emphasis added), and 8 U.S.C. § 1252(g) correspondingly barred review of a claim to enjoin *deportation proceedings* where the claimants were also charged with technical violations of the INA as the grounds for their removal.

In so holding, the Court emphasized the non-punitive nature of *removal*:  "While the consequences of deportation may assuredly be grave, they are not imposed as a punishment." *Id.* at 491.  *Detention* based on one's First Amendment-protected speech is, however, decidedly punitive.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (explaining detention is punitive when it is not justified by "preventing flight" or demonstrated "dangerousness").  And any reading of the INA that prevented constitutional claims seeking relief from detention would, unlike the claims at issue in *AADC*, strike squarely at the constitutional core of habeas.  *Thuraissigiam*, 591 U.S. at 107.

That result is not required by the INA.  As the district court in *Öztürk* rightly found*,* for example, none of the INA's jurisdictional bars on which the government relies operate to strip a district court's jurisdiction to review a habeas claim seeking relief from unconstitutional detention.  779 F. Supp. 3d at 480–86.  The alternative would allow the government to wield detention as a tool to smother disfavored speech and reporting for months or years, so long as it is also pursuing removal proceedings against the person it wishes to silence.  And requiring non-citizen journalists to wait to seek relief from an unconstitutional detention until a petition for

6

review can be filed not only silences them, but it also deprives their audience of crucial reporting on matters of public concern.

Furthermore, a retaliatory detention has an "immediate and irreversible" impact on the right to gather and report the news, as much so as any classic prior restraint. *Neb. Press Ass'n*, 427 U.S. at 559. For instance, in the context of on-the-scene newsgathering, the arrest of a journalist prevents the capture of "a unique set of images that might otherwise hold officials accountable." John S. Clayton, Note, *Policing the Press: Retaliatory Arrests of Newsgatherers After* Nieves v. Bartlett, 120 Colum. L. Rev. 2275, 2289 (2020). Addressing detentions and arrests generally, the Supreme Court has recognized that "some police officers may exploit the arrest power as a means of suppressing speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 99 (2019). As such, the danger of the government imposing retaliatory detentions on disfavored journalists would be an extreme form of First Amendment injury. And the "loss of First Amendment freedoms, *for even minimal amounts of time*, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added).

In addition to the immediate freeze on newsgathering and reporting by the detained journalist, the threat of indefinite detention could also unquestionably chill *other* non-citizen journalists from reporting on matters that may prove politically controversial. "[E]ven minor punishments can chill protected speech," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002), and immigration detention pending adjudication can last for months or years. Non-citizen journalists faced with the risk of months-long detention may be discouraged from reporting or publishing on matters that could draw the attention of immigration authorities— further suppressing First Amendment-protected activity.

7

There are indications this is already happening. Some non-citizen journalists based in the United States are taking steps to self-censor in response to the federal government's stepped-up immigration enforcement. *See, e.g.*, Angela Fu, *Foreign Journalists in the U.S. are Self-Censoring to Protect Themselves from the Trump Administration*, Poynter (July 14, 2025), https://perma.cc/CY3Z-ZYG6.

Estefania Bermudez, for example, is a reporter based in Detroit who is also a DACA recipient. She told American Community Media she is often asked to cover ICE raids in Michigan because of her "rooted perspective" and expertise with the immigration system. Peter Schurmann, *Amid Deportations, Immigrant Journalists Face Heightened Risks for Their Reporting*, American Community Media (Apr. 24, 2025), https://perma.cc/X4HD-5RMA. Bermudez has personally reported the chilling effect of the government's immigration enforcement tactics, stating that she is now more likely to turn down certain stories because she fears her reporting could make her a target. *Id.*

Were the government's jurisdiction-stripping arguments credited, the threat of detention based expressly on protected speech, including news reporting, would significantly amplify this chilling effect.

## II. Non-citizen journalists perform important public interest newsgathering and reporting every day, and often have special skills crucial to covering certain beats.

There are many thousands of non-citizen journalists working in the United States whose speech is entitled to full First Amendment protection. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). For instance, the primary non-immigrant visa for foreign journalists working for foreign publications is the I-Visa. There were 12,150 journalists admitted on that visa in 2021, 25,270 admitted in 2022, and 32,470 admitted in 2023. *See* Aneer Rukh-Kamaa, *U.S. Nonimmigrant Admissions:*

8

*2023*, U.S. Dep't of Homeland Sec., Office of Statistics, at 2 (Aug. 2024), https://perma.cc/4L3U-UC6V.  There are many more non-citizen journalists working under different visas or who are permanent residents.

Foreign-born and non-citizen journalists are often uniquely situated to report or write on topics of importance based on particular personal experiences and cultural understandings.  For example, Lingling Wei is the chief China correspondent for *The Wall Street Journal*, based in New York.  *Lingling Wei,* Wall St. J., https://perma.cc/9434-86H3 (last visited July 30, 2025).  Wei is a Chinese-born reporter who became a naturalized U.S. citizen in 2010, after she had spent eleven years studying and then working as a journalist in New York.  Lingling Wei, *Forced to Leave China—and My Family*, Wall St. J. (June 6, 2020), https://perma.cc/PRE2-RFUA.  After becoming a naturalized citizen, Wei worked for a decade in the *Journal*'s China Bureau, but she was expelled from China in 2020 along with several other American journalists, at which point she returned to the U.S.  *Id.*  She and several other members of the staff of the *Journal*'s Beijing Bureau were finalists for a Pulitzer Prize in 2021 for their in-depth series on China's leader, Xi Jinping.  *See Finalist: Staff of The Wall Street Journal*, The Pulitzer Prizes, http://bit.ly/4fcczDv (last visited June 13, 2025).  Wei's recent work has included coverage of U.S.-China trade negotiations, Lingling Wei et al., *China Puts Six-Month Limit on Its Ease of Rare-Earth Export Licenses*, Wall St. J. (June 11, 2025), https://perma.cc/U55V-8J99; China's involvement in negotiations to end the war in Ukraine, Lingling Wei et al., *China Tries to Play the Role of Peacemaker in Ukraine*, Wall St. J. (Feb. 13, 2025), https://perma.cc/X8JM-7UVG; as well as Chinese domestic affairs,  Lingling Wei, *Behind Xi Jinping's Pivot on Broad China Stimulus*, Wall St. J. (Oct. 15, 2024), https://perma.cc/6DZY-SQXC.

9

Similarly, Jorge Ramos worked for forty years as a news anchor based in Miami for Univision, providing news coverage to the Spanish-speaking community in the United States. Jesus Jiménez, *Jorge Ramos to Leave Univision After 40 Years at the Network*, N.Y. Times, (Sept. 9, 2024), https://perma.cc/WQ53-QTTD.  Ramos immigrated to the United States from Mexico on a student visa in 1983 and did not become a U.S. citizen until 2008.  Rigoberto Hernandez, *Journalist Jorge Ramos Takes on Obama, Republicans*, NPR (Feb. 2, 2015), https://perma.cc/E6M2-L8VK.  He has been called the "Walter Cronkite of Latino America" and his nightly news show averaged over a million viewers.  *Id.*  As an immigrant himself, he is well-positioned to serve the informational needs of his audience.  Stephania Taladrid, *Jorge Ramos, the Voice of Latino America*, The New Yorker (Aug. 17, 2024), https://perma.cc/YQZ5-ELW3. His background and skills have allowed him to interview not only sitting U.S. Presidents, such as Barack Obama and George W. Bush, but also Spanish-speaking leaders of many Latin American countries, including Fidel Castro and Hugo Chávez.  *Id.*  As such, his reporting offers unique insights into his subjects.  *Id.*

As these examples illustrate, foreign-born journalists who come to the United States and work as non-citizens—whether they ultimately seek naturalization or not—often possess specialized linguistic and cultural knowledge that makes them particularly skilled at covering certain topics or subjects.  In that way, the chilling effect from detentions of non-citizen journalists may operate like a content- or viewpoint-based restriction by allowing retaliation specifically against, for example, hard-hitting coverage of increased immigration enforcement or other politically sensitive topics.  Courts have rejected viewpoint discrimination as antithetical to our nation's First Amendment, and it is virtually never permitted.  *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is

thus an egregious form of content discrimination."); *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) (calling viewpoint discrimination "poison to a free society").  Yet that is what the government does if and when it uses its immigration enforcement authorities to thumb the scale of public discourse in its own favor.  Absent speedy habeas review, the suppression of disfavored viewpoints through retaliatory detentions could continue unchecked, despite being precisely the kind of "poison" the Constitution forbids.

## CONCLUSION

For the foregoing reasons, amicus respectfully urges this Court to hold that it has jurisdiction to hear and adjudicate Guevara's habeas petition.

Dated: September 4, 2025                           Respectfully submitted,

*/s/ Allyson Veile*
Allyson Veile (Georgia Bar No. 620066)
   *Counsel of record*
Gabriel Rottman*
Lisa Zycherman*
Mara Gassmann*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300
aveile@rcfp.org

*\*Of Counsel*

11