**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**WAYCROSS DIVISION**

MARIO ALEXANDER GUEVARA,
 *Petitioner,*

v.

WARDEN, FOLKSTON ICE
PROCESSING CENTER, et al.,
 *Respondents*.

Case Number: 5:25-cv-00086-LGW

**AMICUS BRIEF OF FREE PRESS, THE COMMITTEE TO PROTECT
JOURNALISTS, PEN AMERICA, FREEDOM OF THE PRESS
FOUNDATION, AND REPORTERS WITHOUT BORDERS
IN SUPPORT OF PETITIONER'S
PETITION FOR WRIT OF HABEAS CORPUS**

Nora Benavidez* (Ga. Bar # 698687)
FREE PRESS
1025 Connecticut Avenue NW
Suite 1110
Washington, DC 20036
(202) 265-1490
nbenavidez@freepress.net

Gerald Weber (Ga. Bar # 744878)
LAW OFFICES OF GERRY WEBER, LLC
P.O. Box 5391
Atlanta, GA 31107
(404) 522-0507
wgerryweber@gmail.com

*Pro hac vice application forthcoming   *Counsel for Amici Curiae*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ..................................................................................... 2

TABLE OF AUTHORITIES ............................................................................... 3

INTEREST OF AMICI CURIAE ....................................................................... 5

INTRODUCTION .............................................................................................. 8

ARGUMENT  ...................................................................................................... 9

      I.      MR. GUEVARA'S FIRST AMENDMENT RIGHTS AS A
             JOURNALIST HAVE BEEN VIOLATED THROUGH GOVERNMENT
             RETALIATION. ............................................................................. 9

      II.     MR. GUEVARA'S CONTINUED DETENTION IS AN
             IMPERMISSIBLE PRIOR RESTRAINT THAT IMPLICATES HIS
             OWN AND THE PUBLIC'S FIRST AMENDMENT RIGHTS. ............ 14

      III.    THE CHILLING EFFECTS IMPLICATED BY THIS CASE ARE
             WIDESPREAD AND PROFOUND. ...................................................... 17

CONCLUSION ................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

### Cases

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002).......................................................... 14

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)................................................. 14, 15

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ......................................................... 9

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) ....................................................... 14

*Bowens v. Superintendent of Mia. S. Beach Police Dep't*, 557 F. App'x 857 (11th Cir. 2014) ....................................................................................................................... 10

*Burke v. Augusta-Richmond Cty.*, 365 F.3d 1247 (11th Cir. 2004) ........................... 15

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ........................... 17

*Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347  (M.D. Ga. 2020) ........................ 11

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017) ....................................... 11

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) ............................................ 16

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011).................................................... 10, 11, 16

*Irizarry v. Yehia*, 38 F.4th 1282 (10th Cir. 2022)........................................................... 11

*Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977) ................... 9, 13

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ................................................ 15

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ................................................. 15

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976)............................................................ 14

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ................................................ 15

*Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503 (6th Cir. 2001) ........................................................................................................................ 15

*Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022) ......................................................... 11

*Se. Promotions v. Conrad*, 420 U.S. 546 (1975)............................................................ 14

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)....................................... 10

*Smith v. Mosley*, 532 F.3d 1270 (11th Cir. 2008) ......................................................... 13

*Toole v. City of Atlanta*, 798 F. App'x 381 (11th Cir. 2019)........................................ 11

*Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017)........................................ 11

*Turner v. Williams*, 65 F.4th 564 (11th Cir. 2023) ........................................................ 9

*United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000)......................................... 14

*Universal Amusement Co.  v. Vance*, 587 F.2d 159 (5th Cir. 1978)........................... 15

*Vasquez Perdomo v. Noem*, No. 25A169, 2025 WL 2585637 (Sept. 8, 2025) ............. 21

## Other Authorities

Angela Fu, *Foreign Journalists in the U.S. Are Self-Censoring to Protect Themselves from the Trump Administration*, Poynter (July 14, 2025) ................................ 20, 21

Freedom of the Press Found., *Incident Database*, U.S. Press Freedom Tracker ...... 20

Freedom of the Press Found., *Journalist nearly trampled, shot with munition at LA immigration protest*, U.S. Press Freedom Tracker (June 11, 2025) ...................... 19

Freedom of the Press Found., *Journalist struck by foam round while covering LA immigration protest*, U.S. Press Freedom Tracker (June 9, 2025) ...................... 19

Freedom of the Press Found., *West Texas reporter forcibly removed from public meeting*, U.S. Press Freedom Tracker (June 27, 2025)........................................... 19

Gemma DiCarlo, *What news coverage looks like on livestreaming platform Twitch*, Or. Pub. Broad. (May 13, 2024) ................................................................... 18

Gustavo Valdés, Abel Alvarado, & Jonny Hallam, '*They stormed the place, detaining everyone': Latinos recount huge ICE raid at Hyundai plant*, CNN (Sept. 7, 2025) 16

Joe Hernandez, *Darnella Frazier, Who Filmed George Floyd's Murder, Wins an Honorary Pulitzer*, NPR (June 11, 2021) .................................................. 18

Katherine Jacobsen, *Alarm bells: Trump's first 100 days ramp up fear for the press, democracy*, Comm. to Protect Journalists (Apr. 30, 2025) ...................................... 21

Mario Guevara, *A Letter From Detained Journalist Mario Guevara*, ACLU (Sept. 24, 2025) ......................................................................................................... 13

Mario Guevara, *Letter from ICE Detention Facility*, Bitter Southerner (Sept. 19, 2025) ......................................................................................................... 13

Megan Mulligan, *The 2021 Pulitzer Prize Announcement*, Pulitzer Prizes (June 11, 2021) ......................................................................................................... 19

Safiyah Riddle, *Families in crisis after massive immigration raid at Hyundai plant in Georgia*, Assoc. Press (Sept. 13, 2025) ................................................. 16

## <u>INTEREST OF AMICI CURIAE[1]</u>

**Free Press** is a non-partisan, nonprofit, nationwide media and technology advocacy organization. Since its founding in 2003, Free Press has sought to change the media in order to transform democracy in furtherance of a just society. It believes that positive social change and meaningful engagement in public life require equitable access to open channels of communication, as well as journalism that holds leaders accountable. Free Press engages in litigation, policy advocacy, and administrative agency proceedings to protect civil rights, free expression, and equitable access to information and ideas. The organization is supported by over one million members who sign petitions, visit lawmakers, participate in protests, and mobilize other activists in their communities.

**Committee to Protect Journalists (CPJ)** is an independent, nonprofit organization that was founded in 1981 to promote press freedom worldwide. It defends the right of journalists to report the news without fear of reprisal. CPJ is a global organization headquartered in the United States that engages in awareness-raising, advocacy and the provision of emergency assistance for at-risk journalists. CPJ's board of directors is composed of prominent journalists, media executives, and leaders from related professions.

**Freedom of the Press Foundation (FPF)** is a nonprofit 501(c)(3) organization founded in 2012 with a mission to protect public interest journalism.

---

[1] No counsel for a party authored this brief in whole or in part. No person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission.

FPF works to protect journalists and their sources by building secure communications tools, providing digital security trainings and open-source resources for journalists, and advocating for freedom of speech and of the press. It also manages the U.S. Press Freedom Tracker, a database of press freedom violations in the United States. FPF regularly writes about and participates in legal proceedings to oppose legislation, laws, or court orders that violate the First Amendment and undermine press freedoms.

**PEN American Center, Inc. ("PEN America")** is a nonpartisan nonprofit organization working at the intersection of literature and human rights. Founded in 1922, PEN America advocates for free expression and the interests of writers and journalists in the United States and abroad. Its membership includes more than 5,000 writers, journalists, literary professionals, and readers nationwide. PEN America protects press freedom and journalists by combatting disinformation, defending journalists against online abuse, and supporting local news.

**Reporters Without Borders (RSF USA)** is the US affiliate of the independent international non-profit organization Reporters sans frontièrs ("RSF") that defends the right of every human being to have access to free and reliable information. RSF acts for the freedom, pluralism, and independence of journalism and defends those who embody these ideals. RSF advocates for press freedom throughout the world by monitoring and communicating on abuses committed against journalists and on all forms of censorship, including by publishing the annual World Press Freedom Index, which measures the state of press freedom in 180

6

countries. RSF regularly acts before national and international judicial or quasi-judicial bodies (including UN human rights organs) and regularly files amicus briefs in support of media freedom.

## **INTRODUCTION**

To put it plainly, law enforcement officials disliked Mr. Guevara's reporting of their conduct, so they detained him. Notwithstanding an immigration judge ordering his release on bond, the government has sought to keep him detained for the foreseeable future. As a result, Mr. Guevara has been detained for 104 days, with no relief in sight, and he cannot perform his job as a journalist. The Board of Immigration Appeals (BIA) has since ordered Mr. Guevara deportable back to El Salvador, where he would likely face irreparable harm, including safety concerns and separation from his family, livelihood, and community. That order could trigger his removal at any time, which could in turn derail this pending federal litigation and this Court's opportunity to consider the constitutional issues raised. In that event, deportation without due process for Mr. Guevara hangs in balance and would be a considerable decline in our country's commitment to the rule of law.

From detention in Folkston, Georgia, Mr. Guevara has had limited access to legal counsel, family, and even other inmates, as he has been in solitary confinement most of his 104 days in custody. He cannot observe and document the issues that affect his community and the greater public at large, nor can he publish those findings. In other words, the government has succeeded in its goal of muzzling Mr. Guevara, chilling his future reporting and other journalists' speech that might seek to expose the government's activities.

It is this course of events against which the First Amendment is specifically meant to safeguard—protecting individuals who seek to hold government officials accountable on the public stage, without fear of retribution or sanction.

In this brief, *amici* offer three arguments in support of Mr. Guevara's habeas petition. First, we argue that Mr. Guevara's continued detention is retribution in violation of the First Amendment. Second, we argue that the ongoing detention is a prior restraint on Mr. Guevara's speech rights and those of the public who are denied access to his future reporting. Finally, *amici* document the grave chilling implications of Mr. Guevara's continued detention for journalists and everyday individuals.

In light of all of those reasons, *amici* respectfully urge this Court to grant Mr. Guevara's petition for writ of habeas corpus.

## **ARGUMENT**

### I.  **Mr. Guevara's First Amendment Rights as a Journalist Have Been Violated Through Government Retaliation.**

The government's refusal to release Mr. Guevara constitutes First Amendment retaliation for his reporting on law enforcement activity. To state a First Amendment retaliation claim, Mr. Guevara must show that: (1) that he was engaged in constitutionally protected speech; (2) that the government's retaliatory conduct adversely affected the protected speech; and (3) that plaintiff's speech was a substantial motivating factor for the government's retaliatory conduct. *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977); *Turner v. Williams*, 65 F.4th 564, 579 (11th Cir. 2023) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)) (Section 1983 suit context). Each of these elements are met.

First, Mr. Guevara was clearly engaged in constitutionally protected speech, and this speech is the underlying predicate for his continued detention. As Mr. Guevara's habeas petition notes, the government's filings demonstrate that the underlying predicate of its justification for keeping Mr. Guevara detained is his reporting activity. *See* Pet. ¶¶ 68, 71–72, 86, ECF No. 1. This reporting activity includes Mr. Guevara's "'record[ing] or live stream[ing of]' law enforcement officers and 'post[ing] videos of undercover agents, their vehicles, and tag numbers'" recorded while the officers were in public. *Id.* ¶ 68.

This type of conduct is plainly protected by the First Amendment; the Eleventh Circuit recognizes the First Amendment right to photograph and videotape police conduct. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see also Bowens v. Superintendent of Mia. S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014) (holding that plaintiff had plausibly stated a First Amendment violation by claiming "he was arrested for taking photographs of alleged police misconduct and police then deleted the photographs he took"). Though the government argues that Mr. Guevara's reporting raised safety issues for law enforcement because it publicized information about officers when performing their official duties, "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith*, 212 F.3d at 1333; *see also Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [the

First Amendment.]"); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) ("[T]he First Amendment protects the right to record the police."); *Fields v. City of Philadelphia*, 862 F.3d 353, 362 (3d Cir. 2017) ("[Police] officers are public officials carrying out public functions, and the First Amendment requires them to bear bystanders recording their actions."); *Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347, 1366 (M.D. Ga. 2020) (noting that "Eleventh Circuit precedent holds that law enforcement officers may not arrest an individual as a way 'to thwart or intrude upon First Amendment rights otherwise being validly asserted'") (quoting *Toole v. City of Atlanta*, 798 F. App'x 381, 387 (11th Cir. 2019)).

To be sure, this First Amendment right is not limitless. But "peaceful recording . . . in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik*, 655 F.3d at 84. As Mr. Guevara's habeas petition notes, footage of the events leading to his arrest shows that his reporting activity did not interfere with the officers' duties—he moved away to avoid obstructing oncoming police officers while filming and positioned himself away from the protestors themselves to distinguish himself as press. *See* Pet. ¶¶ 39, 41; *cf. Price v. Garland*, 45 F.4th 1059, 1071 (D.C. Cir. 2022) ("[I]t is unreasonable to issue a blanket prohibition against the recording of a public official performing public duties on public property, so long as the recording does not interfere with the performance of the official's duties."); *Irizarry v. Yehia*, 38 F.4th 1282, 1292 n.10 (10th Cir. 2022) (no time, place, and manner restriction issue where peaceful recording of a traffic stop did not interfere with the police officers' performance of their duties,

even though plaintiff voiced their disapproval of the officer's intentional obstruction of content gathering and "loudly criticized" the officer because "their protests did not impede officers from performing their duties"). Indeed, this reality is also reflected in DeKalb County's determination that "video evidence demonstrated that Mr. Guevara had not defied orders by law enforcement but was 'generally in compliance' and did 'not demonstrate the intent to disregard law enforcement directives.'" Pet. ¶ 74. Without any cognizable issue of interference, Mr. Guevara's reporting activity falls well within the protected sphere of the First Amendment.

Second, Mr. Guevara's continued detention clearly adversely affects his protected speech. Indeed, as is evident in the government's filings, preventing Mr. Guevara from speaking further is precisely the government's goal. It argues that Mr. Guevara is a danger to the community, and thus should not be released from detention on bond, *because* of his reporting. *See id.* ¶ 71 (quoting the government's stay motion in BIA proceedings). It is indisputable that this continued detention, for a duration of which Respondents cannot even provide an estimate, adversely affects Mr. Guevara's speech because he cannot do his job as a reporter while detained. *See id.* ¶ 91.

Mr. Guevara's continued detention also hinders the ability of his news organization, MG News, to report more broadly. Mr. Guevara is the primary newsgatherer for MG News and uniquely possesses many of the community ties on which the organization relies for sources and leads. *See id.* ¶ 94 (noting that MG News's reporting has decreased from six posts per day to two to three posts per day

following Mr. Guevara's detention). In a letter from his ICE detention facility, Mr. Guevara notes that since his detention, MG News is "on the verge of bankruptcy." Mario Guevara, *Letter from ICE Detention Facility*, Bitter Southerner (Sept. 19, 2025), https://bittersoutherner.com/journalist-mario-guevara-speaks-letter-from-ice-detention-facility-english.[2]

Third, the government's retaliatory conduct here is the substantial motivating factor, if not entire cause of Mr. Guevara's injury. *See Mt. Healthy*, 429 U.S. at 287; *see also Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) (finding that the "causal connection inquiry" of a First Amendment retaliation claim asks "whether the defendants were subjectively motivated" by the plaintiff's protected activity). Here, the link between the government's retaliatory animus against Mr. Guevara's speech and his continued detention is clear. The government's own filings indicate that Mr. Guevara's continued detention is predicated on his protected First Amendment reporting activity, remarking that Mr. Guevara is ostensibly a danger to the community "because Mr. Guevara had 'on five separate occasions . . . recorded or live streamed' law enforcement officers and 'post[ed] videos of undercover agents, their vehicles, and tag numbers.'" Pet. ¶ 68 (government's BIA notice of appeal); *see also id.* ¶¶ 71–72 (reliance on similar arguments in government's BIA stay motion).

---

[2] This letter, alongside another brief letter Mr. Guevara wrote about the circumstances of his detention, *see* Mario Guevara, *A Letter From Detained Journalist Mario Guevara*, ACLU (Sept. 24, 2025), https://www.aclu.org/news/free-speech/a-letter-from-detained-journalist-mario-guevara, are the only instances the public has heard from Mr. Guevara, except for updates to his social media posted by family.

In sum, each of the three retaliation requirements having been met, Mr. Guevara's continued detention is unconstitutional under the First Amendment.

## II. Mr. Guevara's Continued Detention Is an Impermissible Prior Restraint that Implicates His Own and the Public's First Amendment Rights.

Mr. Guevara's continued and prolonged detention implicates his future speech and the ability of the public to engage with his newsgathering activities. The government's targeting of Mr. Guevara is not isolated to censoring his previous speech and reporting. The government's targeting of Mr. Guevara impedes his future speech and constitutes prior restraint. A prior restraint of expression "exists when the government can deny access to a forum before the expression occurs." *Bourgeois v. Peters*, 387 F.3d 1303, 1319 (11th Cir. 2004) (quoting *United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir. 2000)).

Prior restraint is censorship of the worst kind—it prevents expression from reaching the marketplace of ideas. *See Se. Promotions v. Conrad*, 420 U.S. 546, 559 (1975) ("[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand."). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (demands by government officials which threaten potential legal sanction if one continues to speak are prior restraints even if government officials lack arrest

14

powers, because "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around").

The Supreme Court has explained that "it is the chief purpose of [the First Amendment] to prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713–14 (1931). Thus, "[a]ny prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971); *Bantam Books*, 372 U.S. at 70 (prior restraint "comes to this Court bearing a heavy presumption against its constitutional validity"); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prohibiting prior restraint of "Pentagon Papers"). This is controlling precedent in the Eleventh Circuit. *Burke v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1251 (11th Cir. 2004) ("Prior restraints are presumptively unconstitutional . . . .").

Under the prior restraint doctrine, the government cannot prohibit future expressive activity as a result of past unlawful conduct. *Universal Amusement Co. v. Vance*, 587 F.2d 159, 166 (5th Cir. 1978), *aff'd*, 445 U.S. 308 (1980) (holding unconstitutional a Texas statute which authorized state judges to enjoin the future exhibition of films by a business that had shown obscene films in the past); *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 507 (6th Cir. 2001) ("[W]here a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech."). The government's suppression here is thus all the more impermissible, where there is no criminality

proffered by the government in this case. Nor do any criminal charges even exist against Mr. Guevara as he remains in prolonged detention and at risk of deportation prior to this Court's ability to consider his claims fully.

Alongside this prior restraint on Mr. Guevara's future speech and reporting, the public remains unable to access information that he would typically provide in his newsgathering activities. *See Glik*, 655 F.3d at 82–83 (grounding the First Amendment right to record police in part in the public's constitutional right to receive information and ideas); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."). Numerous local Georgia events implicating the communities who most ardently follow Mr. Guevara's reporting have been left without meaningful local or Spanish-language coverage while he remains in detention. The recent ICE raid on a Hyundai facility—the largest immigration raid in U.S. history—was of tremendous local concern and outcry in Georgia's Spanish-speaking communities. *See, e.g.*, Gustavo Valdés, Abel Alvarado, & Jonny Hallam, '*They stormed the place, detaining everyone': Latinos recount huge ICE raid at Hyundai plant*, CNN (Sept. 7, 2025), https://www.cnn.com/2025/09/07/us/hyundai-ice-raid-legal-latinos-detained-intl-latam; Safiyah Riddle, *Families in crisis after massive immigration raid at Hyundai plant in Georgia*, Assoc. Press (Sept. 13, 2025), https://apnews.com/article/georgia-immigration-raid-hyundai-families-bf4a28e96645 316d759de50d09928594 (reporting how many of the non-Korean immigrants swept

up in the raid "remain in legal limbo or are otherwise unaccounted for"). Mr. Guevara was not able to cover this breaking story, nor was he able to conduct field reporting in the communities most affected by the government's conduct. And his readers and viewers were left worse off as a result. Certainly, this is the point of the government's retaliation against Mr. Guevara.

## III. The Chilling Effects Implicated by this Case Are Widespread and Profound.

This case has grave implications beyond Mr. Guevara's immediate irreparable injury. The scope of the First Amendment injury caused by the government's retributive conduct is greater than the sum of its parts. *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757–62 (1988). Not only do the government's actions impact the First Amendment rights of Mr. Guevara and the public, but they also take aim at journalists covering current affairs more broadly.

As discussed above, the government has made clear that it takes issue with Mr. Guevara's journalism covering law enforcement officials, and that his reporting activity is the predicate for their seeking his continued detention. But Mr. Guevara's reporting implicated here is emblematic of journalistic practices much more broadly—journalists often rely on livestreaming, and when covering public affairs, regularly film public officials. The government's retributive conduct here, if not addressed by this Court, will have a drastic effect on both livestreaming and journalistic activities as a whole. It will serve as implicit confirmation that law enforcement can detain journalists for simply filming them.

Livestreaming video has become a crucial tool in modern journalism. *See* Gemma DiCarlo, *What news coverage looks like on livestreaming platform Twitch*, Or. Pub. Broad. (May 13, 2024), https://www.opb.org/article/2024/05/13/think-out-loud-news-twitch-streaming-streamers-broadcast-politics/ (media studies researcher discussing use of livestreaming by mainstream media outlet, left-leaning political commentator, and right-wing media channel, and how livestreaming is "an incredibly powerful tool both from the perspective of journalism, and then also from sort of affiliated journalistic professions like political commentating"). The practice has democratized journalism, lowering costly barriers to entry like traditional news equipment, and enabling small business, independent, and citizen journalists to effectively report important information. It also allows for rapid, on-the-ground transmittal of events, where anyone who happens to be at a particular moment at the right time can share what is happening with the entire online community, as well as engagement between journalists and their audiences. *See id.* (discussing how users of Twitch, a livestreaming gaming platform "are turning towards it for news consumption [because of the] hours-long nature of the streams").

That reporting can include holding law enforcement accountable for their public conduct. For example, Darnella Frazier recorded the murder of George Floyd by police officer Derek Chauvin, a video that set off an entire national and global movement against police brutality and systemic racism. *See* Joe Hernandez, *Darnella Frazier, Who Filmed George Floyd's Murder, Wins an Honorary Pulitzer*, NPR (June 11, 2021), https://www.npr.org/2021/06/11/1005601724/darnella-frazier-teen-who-

filmed-george-floyds-murder-wins-pulitzer-prize-citati.[3] The public relies on such reporting, as well as the very type of reporting for which Mr. Guevara was detained. Accordingly, antagonistic conduct against journalists from law enforcement raises concerning questions about other journalists being targeted in the future, and the important stories that journalists won't report out of fear for such targeting.

Mr. Guevara's detention, though noticeably more prolonged than others, is part of a growing list of recent attacks against the press. *See* Freedom of the Press Found., *West Texas reporter forcibly removed from public meeting*, U.S. Press Freedom Tracker (June 27, 2025), https://pressfreedomtracker.us/all-incidents/west-texas-reporter-forcibly-removed-from-public-meeting/ (forced removal and citation of a reporter in Big Bend, Texas for livestreaming a meeting of the Jeff Davis County Commissioners Court); Freedom of the Press Found., *Journalist nearly trampled, shot with munition at LA immigration protest*, U.S. Press Freedom Tracker (June 11, 2025), https://pressfreedomtracker.us/all-incidents/journalist-nearly-trampled-shot-with-munition-at-la-immigration-protest/ (reporter shot with a crowd-control munition in Los Angeles while livestreaming a protest); Freedom of the Press Found., *Journalist struck by foam round while covering LA immigration protest*, U.S. Press Freedom Tracker (June 9, 2025), https://pressfreedomtracker.us/all-incidents/journalist-struck-by-foam-round-while-covering-la-immigration-protest/

---

[3] In recognition of this important reporting, the Pulitzer Board awarded Ms. Frazier a special citation as part of the 105th class of Pulitzer Prize Winners in Journalism, Books, Drama and Music. *See* Megan Mulligan, *The 2021 Pulitzer Prize Announcement*, Pulitzer Prizes (June 11, 2021), https://www.pulitzer.org/article/2021-pulitzer-prize-announcement.

(livestreaming journalist short with a foam round while filming police conduct during protests in Los Angeles). *See generally* Freedom of the Press Found., *Incident Database*, U.S. Press Freedom Tracker, https://pressfreedomtracker.us/all-incidents/?search=livestream&endpage=2&sort=NEWEST (cataloguing more incidents of press freedom violations). These examples show that journalists often rely on livestreaming to report pressing issues to the public—just as Mr. Guevara was doing immediately before he was detained, and just as the government took issue with—already face risks with such activity, and they have reason to be fearful that Mr. Guevara's fate could fall on them next. Whether Mr. Guevara's First Amendment rights can be properly vindicated here will have an impact on whether journalists feel safe from government targeting while doing their jobs.

The stakes of this case are particularly high for non-citizen journalists who are already self-censoring in response to this administration's treatment of non-citizen journalists like Mr. Guevara. *See* Angela Fu, *Foreign Journalists in the U.S. Are Self-Censoring to Protect Themselves from the Trump Administration*, Poynter (July 14, 2025), https://www.poynter.org/reporting-editing/2025/foreign-journalists-in-the-u-s-are-self-censoring-to-protect-themselves-from-the-trump-administration ("As President Donald Trump and his administration have cracked down on immigration and free speech alike, some non-citizen journalists working in the U.S. have started to censor themselves, wiping their social media accounts and avoiding making statements that could be construed as criticism of the administration."). Some reporters have pulled bylines from stories on sensitive subjects that the

administration could view unfavorably, like immigration, some have started using pseudonyms, and others have completely deleted social media accounts. *Id.*

Mr. Guevara's case is a bellwether for the most macabre erosions our First Amendment faces as immigrant reporters are caught in the crosshairs of the administration's efforts to clamp down on immigration while also subject to the retaliatory whims of the president's attacks on the media industry writ large. The U.S. Supreme Court has affirmed that law enforcement agencies may engage in racial profiling. *See Vasquez Perdomo v. Noem*, No. 25A169, 2025 WL 2585637, at *3–5 (Sept. 8, 2025). Concurrently, the president himself has promised to go after journalists and newsrooms alike should he dislike their coverage, with a long personal history of using his official and informal authority to exact reprisals for coverage he finds unfavorable. See Katherine Jacobsen, *Alarm bells: Trump's first 100 days ramp up fear for the press, democracy*, Comm. to Protect Journalists (Apr. 30, 2025), https://cpj.org/special-reports/alarm-bells-trumps-first-100-days-ramp-up-fear-for-the-press-democracy.

If this Court chooses to wait until Mr. Guevara's administrative proceedings run their course, the message to others will be clear: the government is free to encroach on individuals' constitutional rights first, and only after an (admittedly, by Respondents) overwhelmed administrative body is able to review might the judiciary step in to address those harms. If the government is able to shirk accountability for its conduct through a jurisdictional shell game, it is unclear whether those

constitutional claims will be adequately addressed at all.[4] The public and reporting community are smart enough to read the writing on the wall, and will act accordingly by curbing their conduct despite their constitutional rights. That chilling effect will be devastating for journalism and public discourse more broadly.

## <u>CONCLUSION</u>

In light of the foregoing, *amici* respectfully request that this Court grant Mr. Guevara's petition for writ of habeas corpus.

Dated: September 26, 2025                    Respectfully submitted,

<u>/s/ Gerald Weber</u>
Nora Benavidez* (Ga. Bar # 698687)    Gerald Weber (Ga. Bar # 744878)
FREE PRESS                            LAW OFFICES OF GERRY WEBER, LLC
1025 Connecticut Avenue NW            P.O. Box 5391
Suite 1110                            Atlanta, GA 31107
Washington, DC 20036                  (404) 522-0507
(202) 265-1490                        wgerryweber@gmail.com
nbenavidez@freepress.net

*Pro hac vice application             *Counsel for Amici Curiae*
forthcoming

---

[4] The Board of Immigration's September 19, 2025 Order solidifies this concern, if this Court does not weigh in on Mr. Guevara's constitutional grievances as a result of it.

## CERTIFICATE OF SERVICE

Per Local Rule 5.1, I certify that on September 26, 2025, I electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished through the CM/ECF system.


Dated: September 26, 2025          /s/ Gerald Weber
                                   Gerald Weber (Ga. Bar # 744878)
                                   LAW OFFICES OF GERRY WEBER, LLC
                                   P.O. Box 5391
                                   Atlanta, GA 31107
                                   (404) 522-0507
                                   wgerryweber@gmail.com

                                   *Counsel for Amici Curiae*